**The STATE of Ohio, Appellee,**

**v.**

**JOHNSON, Appellant.**

(Cite as *State v. Johnson* (1992), 79 Ohio App.3d 343.]

Court of Appeals of Ohio,
Franklin County.

No. 91AP–958.

Decided April 9, 1992.

■

■

*Michael Miller,* Prosecuting Attorney, *Joyce S. Anderson* and *Jeffrey A. Plunkett,* Assistant Prosecuting Attorneys, for appellee.

*Abraham Law Offices, William J. Abraham* and *Rick J. Abraham,* for appellant.

JOHN C. YOUNG, Presiding Judge.

In November 1990, the Franklin County Grand Jury returned a five-count indictment against appellant, Billy Joe Johnson. Count 1 of the indictment charged appellant with aggravated murder with prior calculation and design, in violation of R.C. 2903.01(A). Count 2 of the indictment charged appellant, in the alternative, with aggravated murder during the commission of aggravated robbery, in violation of R.C. 2903.01(B). Both counts involved the death of one victim, Paul Combs ("Combs"), and each carried two identical death penalty specifications.

The first death penalty specification alleged, pursuant to R.C. 2929.04(A)(7), that the aggravated murder was committed while appellant was committing or attempting to commit, or fleeing immediately after committing or attempting to commit an aggravated burglary. The second death penalty specification alleged, pursuant to R.C. 2929.04(A)(5), that the aggravated murder was part of a course of conduct involving the purposeful killing of or attempt to kill two or more persons.

Counts 3 and 4 of the indictment charged appellant with attempted aggravated murder, in violation of R.C. 2923.02(A), involving the shooting of appellant's ex-wife, Rebecca Johnson ("Johnson"). Count 3 alleged attempted aggravated murder with prior calculation and design while Count 4 of the indictment alleges attempted murder during the commission of an aggravated burglary.

Count 5 of the indictment charged appellant with aggravated burglary. All counts in the indictment contained a firearm specification in accordance with R.C. 2941.141.

On June 6, 1991, the jury returned a general verdict. As to Count 1, the jury found appellant not guilty of aggravated murder with prior calculation and design, but guilty of murder. As to Count 2, the jury found the appellant guilty of aggravated murder while committing an aggravated burglary. The jury also found appellant guilty of both death penalty specifications alleged in the indictment. As to Count 3, the jury found appellant not guilty of

attempted aggravated murder with prior calculation and design, but guilty of attempted murder. As to Count 4, appellant was found guilty of attempted aggravated murder and, as to Count 5, appellant was found guilty of aggravated burglary. Furthermore, the jury found that appellant had a firearm on or about his person or under his control as to all counts in the indictment.

As to Counts 1 and 2, the trial court sentenced appellant to a term of life, with parole eligibility after twenty full years, with an additional three years of actual incarceration for the use of a firearm. As to Counts 3 and 4, the trial court sentenced appellant to serve a period of time not less than seven years nor more than twenty-five years. As to Count 5, the trial court sentenced appellant to serve a period of time not less than ten years nor more than twenty-five years. The seven to twenty-five year sentence and the ten to twenty-five year sentence were ordered to be served concurrently with the twenty-to-life sentence, with each other, plus the three years' actual incarceration.

It is from this judgment and sentence that appellant appeals and asserts the following six assignments of error:

"I. The trial court committed error prejudicial to defendant-appellant when, over defendant-appellant's objection, it instructed the jury that defendant-appellant had the burden to prove by a preponderance of the evidence the existence of sudden passion or fit of rage, thereby depriving defendant-appellant of his right to a fair trial under the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

"II. The trial court committed error prejudicial to appellant by providing to the jury a misleading, confusing and improper instruction as to the element of 'intent to commit any felony' contained in the offense of aggravated burglary.

"III. The trial court erred in refusing to instruct the jury on the lesser included offense of involuntary manslaughter under R.C. Sec. 2903.04(B), death caused by the commission of the misdemeanor of aggravated menacing, R.C. Sec. 2903.21, where the evidence would have supported a conviction of the lesser included offense, thereby denying defendant a fair trial as required by the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

"IV. The trial court erred to the prejudice of appellant in refusing to instruct the jury on the offenses of felonious assault and aggravated assault as lesser included to the offense of attempted aggravated murder.

"V. The cumulative effect of the erroneous jury instructions worked to deprive appellant of a fair trial, as guaranteed by the United States and Ohio Constitutions.

"VI. The verdicts finding appellant guilty of aggravated murder, attempted aggravated murder and aggravated burglary were against the manifest weight of the evidence and contrary to law."

█ In the first assignment of error, appellant argues that the trial court erred in instructing the jury that appellant had the burden to prove by a preponderance of the evidence that he acted while under the influence of sudden passion or a sudden fit of rage, either of which was brought on by serious provocation. Establishment of the existence of sudden passion or a sudden fit of rage serves to mitigate a defendant's criminal culpability. See *State v. Muscatello* (1978), 55 Ohio St.2d 201, 9 O.O.3d 148, 378 N.E.2d 738, paragraph two of the syllabus.

It is well known that a dispute exists among the members of this court as to the issue of who bears the burden of proof on the mitigating factor of sudden passion. Some members of this court consider the existence of mitigating factors in the same vein as the existence of an affirmative defense and hold that a defendant has the burden of establishing the existence of a mitigating factor by the preponderance of the evidence. Other members of this court take the position that, in *Muscatello*, the Ohio Supreme Court expressly held that a defendant is not required to prove mitigating factors by a preponderance of the evidence in order to reduce murder to voluntary manslaughter. This issue has yet to be resolved by the Supreme Court; however, the Ohio Supreme Court has granted the state's motion for leave to appeal this court's decision in *State v. Rhodes* (Nov. 27, 1990), Franklin App. No. 90AP–289, unreported, 1990 WL 190234.[1]

For the sake of argument, this court will address this issue from the position most favorable to appellant. Therefore, even assuming that the trial court erred in its charge by placing the burden on appellant to prove the existence of sudden passion or sudden fit of rage by a preponderance of the evidence, reversal is not required unless appellant was prejudiced by such error. This requires a review of the evidence before the trial court.

Rebecca Bond, resident manager at the apartment complex where Johnson continued to live after she and appellant separated for the last time, and her husband Terry, testified that Johnson had asked them to notify her any time that appellant was seen on the premises. They both testified that they had seen appellant in the area approximately fifteen times between July 1990 and October 22, 1990 and that on many occasions they had to ask him to leave. Martin and Crystal Wollett lived next door to Johnson. They testified that

---

**1.** Reporter's Note: That decision has been reversed by the Supreme Court of Ohio in *State v. Rhodes* (1992), 63 Ohio St.3d 613, 590 N.E.2d 261.

they were only acquaintances of Johnson and appellant but they knew that appellant had moved out and that Johnson was living there with her daughter. On October 22, 1990, they heard knocking on their front door in the early morning hours. Johnson was at the door and told them that appellant had shot Combs. While Crystal called the police, Martin checked on Combs. Martin found Combs still alive but unconscious. Crystal stayed with Johnson until the medics arrived.

Kimberly Rawlins, Johnson's daughter, testified that she had known appellant for five or six years. Kim moved in with Johnson after Johnson was divorced from appellant and so did her sister, Stacie. She saw appellant come by the apartment on many occasions and she saw him flatten Johnson's tires once. At the end of the summer, while at the 705 Tavern with Johnson and Combs, appellant and Combs argued at some point in the evening. Kim saw appellant pull a knife on Combs and chase him around the parking lot. Then Kim saw appellant threaten to kill Combs with a gun. The owner of the bar called the police; however, appellant had left before the police arrived. Later that evening, Kim saw appellant's truck parked on the street where he could see Johnson's apartment. When she confronted him, he left. Kim moved out of the apartment the first part of October 1990. She testified that she was not aware that Johnson and appellant saw each other or spoke after the divorce on Johnson's initiative. She had heard appellant and Combs threaten each other on many occasions and arguing about Johnson but she had never heard Combs say that he would kill appellant. However, during a birthday party that Combs had for Johnson at his bar, Kim heard appellant say that he had three shotguns at home and that he would blow them all away.

Stacie Rawlins, Johnson's other daughter, testified that she was living with Johnson after Johnson and appellant separated in March 1990. Between March 1990 and July 1990, appellant did not come around the apartment. While Combs came around the apartment a couple of times, she testified that Combs did not spend the night. Between July 1990 and October 22, 1990, Stacie testified that Johnson began getting threats from appellant so her daughter Kim moved in with them. As Johnson and Combs became closer, Combs began sleeping over at the apartment but he did not move in on a permanent basis. One evening, Stacie saw appellant standing outside the window. Sometime in July or August, Stacie testified that she came home and found appellant inside the apartment. Stacie testified that appellant began causing trouble for Johnson after Johnson and Combs started seeing each other.

Johnson testified that she and appellant were married December 21, 1984 and that they were divorced July 7, 1990. She met Combs through appellant,

as they were mutual friends. She and appellant were separated three times before March 1990 when Johnson filed for divorce. Johnson testified that she and appellant dated occasionally between March 1990 and July 1990 when the divorce became final and that they were intimate early on during the separation. After the divorce was final, Johnson had her phone number changed and told the resident manager at the apartment complex that she did not want appellant around the apartment. Although she dated Combs a couple of times before the divorce was final, the two of them were not intimate with each other until after the divorce was final. Johnson further testified that appellant gave her his key back when she asked for it two to three months before the divorce. She stated that she was unaware that appellant had made any copies of the key.

On the night of October 21, 1990, Johnson and Combs went to Combs' bar because he had to work. She consumed eight to nine beers between the hours of 2:00 p.m. and 7:00 p.m. at which time they went to Tee Jaye's restaurant to eat and then went home. Combs parked his car in front of the apartment and the two went to bed. Johnson awoke when she heard Combs calling out appellant's name and she heard the sound of someone being hit. She heard appellant say that he knew he would catch the two of them together. During the struggle, Johnson fell to the floor. Appellant stood behind her and she could feel a gun placed in her back. At that time, appellant told her that she was not going to get away from him. She heard a gunshot, and then felt funny. She heard a second shot and she heard appellant say "I said I'd kill you, you son-of-a-bitch." When she was able to move, Johnson checked on Combs and removed the pillow from in front of his face. She heard Combs make gurgling sounds. Johnson tried to go downstairs but she was unable so she lay down on her daughter's bed. She went downstairs and called 9-1-1; however, they did not seem to be able to hear her. She went next door and awakened her neighbors. The medics came and took her to the hospital, at which time she learned that she had been shot.

On cross-examination, Johnson testified that she and Combs tried not to go to bars where they thought appellant would be. One time they did go to the P & C lounge even though they saw appellant's truck outside. On that evening, appellant and Combs got into an argument. She stated that she never saw Combs with a knife and she did not know whether or not he kept a gun at the bar. Johnson corroborated Kim's testimony concerning the confrontation between appellant and Combs at the 705 Tavern. She stated that she never heard Combs threaten appellant; however, she knew that Combs had brought a gun home from his mother's house in Dayton, Ohio after appellant had threatened them many times.

Patrick Fardal, of the coroner's office, testified that Combs had blunt force injuries on his face which Fardal did not believe to be fist wounds. Combs was shot in the head and died as a result of the gunshot wound. Fardal saw no indication of any injury to Combs' fist and no alcohol was found in his blood system.

Phillip Eddy of the Columbus Police Department testified concerning the collection of the physical evidence. Upon cross-examination, Officer Eddy testified that the mattress was examined for bullet holes; however, no holes were found.

The following people testified on appellant's behalf concerning the relationship between appellant, Johnson and Combs: Janis Daniels, James Sullivan, Maxwell Armstrong, Charles Crawford, Edward Dunn, Steven Walker, Carolyn Wilkes, Carolyn Dunn, and Robert Johnson. All of these people knew appellant, Johnson and Combs and had been friends of appellant for a good number of years. They testified that, when Johnson and Combs were at a bar where appellant was present, Johnson would do things that tended to draw attention to herself, things that might make appellant jealous. She would walk back and forth in appellant's vicinity even when he was shooting pool. Johnson wore outfits which were relatively revealing and she would be very affectionate to Combs.

Crawford testified that in July at the P & C Lounge, he saw Johnson enter the bar by herself and throw her arms around appellant. When appellant told her to stop, Johnson told him that if he was going to be that way, then appellant could give her back the key to her apartment. Dunn testified that in October 1990, at the P & C Lounge, appellant, Combs and Johnson were all present. Appellant and Combs both went to the restroom. When appellant returned from the restroom, he told Dunn that Combs had a gun. When Dunn ask Combs if he had a gun, Combs denied it. Later that evening, Dunn saw Combs pull a knife on appellant. Appellant was able to grab Combs in a bear hug and carry him outside. At that time, appellant took the knife away from Combs and it took four or five patrons to break up the fight. Between June 1990 and October 1990, Dunn observed a lot of arguing between appellant, Johnson and Combs. Dunn was of the opinion that Johnson and Combs flaunted their affair in front of appellant.

Walker testified concerning the fight behind the 705 Tavern approximately two weeks before the fatal shooting. Appellant and Combs had been arguing and appellant asked Walker to bring in his gun from his truck. Walker brought the gun to appellant and appellant put the gun in his pocket. The bartender, Alice King, called the police so appellant went to place the gun

back outside in his truck. Combs followed him and pulled a knife. Walker took the gun from appellant before the police arrived.

Wilkes testified that she saw Johnson and appellant at the P & C Lounge in August 1990 shooting pool, talking and hugging. She testified that she saw Johnson and Combs at the P & C Lounge five or six times when appellant was there. They would buy appellant a drink. She stated that she saw Johnson and appellant at the P & C Lounge in August and the first part of September.

Robert Johnson, appellant's brother, testified that appellant moved in with him in March 1990. Johnson came and visited appellant as late as September 1990 and one day the two of them spent the afternoon in appellant's bedroom. Johnson left her car over night one evening in August and she and appellant returned at 11:00 the next morning. Furthermore, he testified that Johnson often called appellant and that she called him at 4:00 a.m. just two weeks before the shooting.

Appellant testified on his own behalf that Johnson started going to Combs' bar before the two separated in March 1990. Appellant noticed the two of them were becoming like strangers. Although appellant gave Johnson money to pay the bills, appellant began noticing that the bills were not being paid. On March 17, 1990, Johnson came home at 5:30 in the morning. Appellant confronted her concerning the rumors that he had heard that she and Combs had been all over each other. Johnson told him that that was not true but that Combs had just given her a little kiss. He testified that he spent the night with Johnson in April after they had separated and that Johnson knew that he had a key to her apartment. Appellant further testified that he and Johnson were intimate between the time of the separation and the time that the divorce was finalized. Furthermore, appellant stated that Johnson had indicated to him that she was going to drop the divorce and that it was unnecessary for him to appear in court. However, the night that their divorce became final, Johnson came to visit him, the two of them engaged in sexual relations, and then Johnson told appellant that she had gone ahead with the divorce. In early July 1990, appellant saw Johnson go into Combs' apartment. He stated that he could not believe that the two of them were actually involved with each other. However, when appellant heard that Johnson and Combs had gone to Dayton together, he called Combs' mother's house and was told that Johnson and Combs were in bed together.

Appellant also recounted the incident at the P & C Lounge that occurred in August when Combs had pulled a gun on him in the bathroom. Furthermore, appellant stated that he found bullet holes in his truck and that Johnson told him that the same thing would happen to him that happened to his truck. Appellant stated that he confronted Johnson regarding her playing Combs and

appellant against each other. Johnson would play "our songs" when she was out with Combs in appellant's presence. Appellant also recounted the fight at the 705 Tavern when he asked Walker to bring his gun in from the truck.

The Thursday before the shooting, appellant was playing in a pool league at the P & C Lounge. Johnson, who was there with Combs, was dressed very seductively that evening. Johnson bumped up against appellant and walked by him very often. On October 21, 1990, appellant testified that he went to Beulah Park, ate in Grove City, and then called his brother to see if he had received any phone messages. Appellant stated that his brother told him that Johnson had left a message for appellant to call her at home. Since Johnson knew that appellant did not have her phone number, appellant decided that he would drop by her apartment. Appellant testified that he had consumed fifteen to twenty beers that evening. When he arrived at the apartment, Combs' car was not parked in front. Appellant used his key to enter the front door and then went upstairs to the bedroom. Upon entering the bedroom, appellant saw two people in bed but did not know who the second person was. As he walked closer to the bed, he realized that it was Combs. Appellant stated that he went crazy telling Combs to leave and that at the same time, Combs was telling him to leave. Suddenly, Combs kicked appellant in the groin several times. Appellant retaliated by hitting Combs with his fist. Appellant assumed that the blunt force trauma injuries to Combs' face were caused by his Naval Academy ring which was damaged during the fight. Approximately fifteen minutes later, Johnson awoke and was accidentally hit by a punch appellant meant for Combs. Appellant stated that he pulled out his gun in order to stop Combs from kicking him in the groin any more. Combs kicked appellant in the hand and the gun discharged accidentally. Appellant stated that the bullet would have had to travel through the mattress before it could have hit Johnson. Combs threw a fan at appellant which hit appellant in the hand and caused the gun to discharge again. Appellant saw Combs fly backwards and noticed that he did not move. Appellant ran downstairs to call the emergency squad. When he heard Johnson call Combs' name, appellant left the apartment and drove to Kentucky. Along the way, appellant threw the gun in the little Miami River because it had caused him so much trouble already.

Appellant argues that there was substantial evidence on the issue of the mitigating factor such as to justify an instruction on voluntary manslaughter. However, based on the facts of this case, and even considering only the evidence offered by appellant, it is difficult to conceive that a reasonable jury could have found that appellant acted " * * * while under the influence of sudden passion or in a sudden fit of rage, either of which is

brought on by serious provocation occasioned by the victim that is reasonably sufficient to incite the person into using deadly force * * *." R.C. 2903.03(A). In order to be serious, provocation must be reasonably sufficient to bring on extreme stress and the provocation must be reasonably sufficient to incite or arouse a defendant into using deadly force. *State v. Ford* (May 6, 1989), Franklin App. No. 88AP-503, unreported, 1989 WL 61753. Appellant simply did not establish that he acted under the influence of sudden passion or in a sudden fit of rage.

Appellant's first assignment of error is not well taken and is overruled.

In the second assignment of error, appellant argues that the trial court erred by providing the jury with a misleading, confusing and improper instruction as to the element of "intent to commit any felony" contained in the offense of aggravated burglary.

The trial court instructed the jury as follows concerning the offense of aggravated burglary:

"The defendant is charged with aggravated burglary in count five of the indictment. Before you can find the defendant guilty of aggravated burglary, you must find that the state has proved beyond a reasonable doubt that on or about the 22nd day of October 1990, in Franklin County, Ohio, the defendant, by force, stealth or deception trespassed in an occupied structure or a separately secured or separately occupied portion thereof with purpose to commit any felony, and, one, the defendant inflicted, attempted to inflict or threatened to inflict physical harm upon Rebecca Johnson and/or Paul Combs, or, two, the defendant had a deadly weapon on or about his person or under his control, or, three, the occupied structure involved was the permanent or temporary habitation of another in which at the time any person was present or likely to be present.

"I have defined for you alternative ways of committing the offense. Before you can find the defendant guilty of an offense involving alternatives, you must be unanimous in your verdict as to any one alternative."

Thereafter, the trial court charged the jury as follows:

"The underlying felony at issue in the aggravated burglary is aggravated murder, which I will define for you in a moment.

"If you find that the state has proved beyond a reasonable doubt that the defendant, by force, stealth or deception trespassed in an occupied structure or a separately secured or separately occupied portion thereof with purpose to commit therein any felony and the defendant inflicted and/or attempted to inflict physical harm upon Paul Combs and Rebecca Johnson and/or the defendant had a deadly weapon on or about his person or under his control

and/or the occupied structure involved was the permanent or temporary habitation of another in which at the time any person was present or likely to be present, you should find the defendant guilty of aggravated burglary. If you find that the state has failed to prove any of those elements beyond a reasonable doubt, you should find the defendant not guilty of aggravated burglary."

Defense counsel objected to the proposed jury instructions and after the charge was given to the jury. However, the trial court correctly determined that defense counsel's objection was not well taken because the charge as prepared and read to the jury was a correct statement of the law. The trial court is not required to tailor the instructions given so that they conform with the specific evidence in a particular case.

Appellant's second assignment of error is not well taken and is overruled.

In the third assignment of error, appellant argues that the trial court erred in refusing to instruct the jury on the lesser included offense of involuntary manslaughter under R.C. 2903.04(B), death caused by the commission of the misdemeanor of aggravated menacing, pursuant to R.C. 2903.21.

Appellant failed to request that the trial court instruct the jury on the lesser included offense of involuntary manslaughter and therefore, appellant is barred from raising the issue on appeal in the absence of plain error. Crim.R. 30 and 52(B); *State v. Williford* (1990), 49 Ohio St.3d 247, 551 N.E.2d 1279. Plain error will be recognized only where, but for the error, the result of the trial would have been different. *State v. Long* (1978), 53 Ohio St.2d 91, 7 O.O.3d 178, 372 N.E.2d 804.

Appellant asserts that the pertinent facts in the present case are indistinguishable from those in this court's decision of *State v. Moore* (1991), 74 Ohio App.3d 334, 598 N.E.2d 1224. In *Moore*, the defendant was robbed of approximately $1,000 which represented the proceeds from a drug sale, by the victim and a male individual posing as her brother. Defendant and his cousin set out to search the robbery area trying to find the two perpetrators and retrieve the money. Defendant's cousin obtained a loaded revolver before their search began. Approximately one-half hour later, defendant spotted the victim on the street. Both defendant and his cousin approached the victim and, when she failed or refused to answer defendant's question regarding the alleged robbery incident, defendant's cousin removed the handgun from his jacket pocket and handed it to the defendant. The revolver discharged at relatively close range to the victim's head and the victim died the next day. At trial, the defendant claimed that the victim reached for the revolver and a "struggle" ensued resulting in the weapon's discharge. In that case, the trial

court instructed the jury on the lesser included offense of involuntary manslaughter predicated upon the misdemeanor of aggravated menacing.

■ Involuntary manslaughter is a lesser included offense of aggravated murder; however, it may only be charged when the evidence would reasonably support both an acquittal on the principal offense and a conviction on involuntary manslaughter. *State v. Thomas* (1988), 40 Ohio St.3d 213, 533 N.E.2d 286.

"Involuntary manslaughter" is defined at R.C. 2903.04(B) as follows:

"No person shall cause the death of another as a proximate result of the offender's committing or attempting to commit a misdemeanor."

"Aggravated menacing" is defined at R.C. 2903.21 as follows:

"(A) No person shall knowingly cause another to believe that the offender will cause serious physical harm to the person or property of such other person or member of his immediate family.

"(B) Whoever violates this section is guilty of aggravated menacing, a misdemeanor of the first degree."

■ Viewing the facts presented by appellant at trial, it is inconceivable that the jury could have concluded that appellant was guilty of aggravated menacing. Appellant did not present any evidence which would indicate that he was merely attempting to scare Johnson and Combs when the firearm discharged during the struggle. The trial court did not err in failing to instruct the jury under a lesser included offense of involuntary manslaughter under R.C. 2903.04(B), death caused by the commission of the misdemeanor of aggravated menacing.

Appellant's third assignment of error is not well taken and is overruled.

■ In the fourth assignment of error, appellant argues that the trial court erred in refusing to instruct the jury on the offenses of felonious assault and aggravated assault as lesser included offenses of attempted aggravated murder. "Felonious assault" is defined at R.C. 2903.11 as follows:

"(A) No person shall knowingly:

"(1) Cause serious physical harm to another;

"(2) Cause or attempt to cause physical harm to another by means of a deadly weapon or dangerous ordnance, as defined in section 2923.11 of the Revised Code."

Viewing the evidence presented by appellant, and only that evidence presented by appellant, the trial court did not err in refusing to charge the jury on felonious assault. According to appellant, the firearm discharged acciden-

tally when Combs kicked him in the hand. It was that bullet which struck Johnson in the back. Appellant testified that he did not even know that Johnson had been shot. Under the facts presented by appellant, the jury could not have possibly found that appellant knowingly caused or attempted to cause physical harm to Johnson by means of a deadly weapon.

When viewing the facts presented by the state, and only those facts presented by the state, the evidence likewise would not support a charge to the jury on the offense of felonious assault. According to the state's evidence, appellant entered Johnson's apartment after seeing Combs' car in front of the apartment. Therefore, appellant knew that Combs and Johnson were both inside the apartment. Appellant proceeded upstairs, quietly opened the door, approached the bed, and began beating Combs in the face. When Johnson awoke, appellant struck her hard enough that she fell out of bed. Appellant stood over Johnson, placed a gun in her back, told her that she should have known she would never have gotten away from him, and pulled the trigger. Appellant than proceeded to tell Combs that Combs should have known that appellant would have killed him, and then appellant shot Combs in the head. The court correctly refused to instruct the jury on the lesser included offense of felonious assault.

"Aggravated assault" is defined under R.C. 2903.12, in pertinent part, as follows:

"No person, while under the influence of sudden passion or in a sudden fit of rage, either of which is brought on by serious provocation occasioned by the victim that is reasonably sufficient to incite the person into using deadly force, shall knowingly:

"(1) Cause serious physical harm to another;

"(2) Cause or attempt to cause physical harm to another by means of a deadly weapon or dangerous ordnance, as defined in section 2923.11 of the Revised Code."

In light of this court's disposition of appellant's first assignment of error, this court has determined that appellant was not acting under the influence of sudden passion or in a sudden fit of rage, either of which was brought on by serious provocation occasioned by the victim. Therefore, the trial court correctly refused to instruct the jury on the offense of aggravated assault.

Appellant's fourth assignment of error is not well taken and is overruled.

In the fifth assignment of error, appellant argues that the cumulative effect of the erroneous jury instructions worked to deprive appellant of a fair trial. In light of this court's disposition of appellant's first, second, third, and fourth assignments of error, all dealing with alleged defects in the court's jury

instructions, appellant's fifth assignment of error is not well taken and is overruled.

In his sixth assignment of error, appellant argues that the verdicts finding appellant guilty of aggravated murder, attempted aggravated murder and aggravated burglary were against the manifest weight of the evidence and contrary to law. In a criminal case, the trier of fact has the primary responsibility for determining the credibility of the witnesses and the relative weights to be given to their testimonies. *State v. DeHass* (1967), 10 Ohio St.2d 230, 39 O.O.2d 366, 227 N.E.2d 212. In determining whether a jury verdict in a criminal case is against the manifest weight of the evidence, an appellate court should consider whether the evidence was reasonably credible or fundamentally incredible, contradicted or uncontradicted, reliable or unreliable, and certain or uncertain. The court will also consider whether testimony was effectively impeached or self-serving and whether important matters were not proved. *State v. Mattison* (1985), 23 Ohio App.3d 10, 23 OBR 43, 490 N.E.2d 926. A judgment in a criminal case should not be reversed as being against the manifest weight of the evidence where there is substantial evidence on which the trier of fact could reasonably find that all the elements of the charged offense have been proved beyond a reasonable doubt. *State v. Hardin* (1984), 16 Ohio App.3d 243, 16 OBR 266, 475 N.E.2d 483.

In this court's discussion of appellant's first assignment of error, this court reviewed the evidence presented at trial. Obviously, the jury found that the witnesses who testified on behalf of the state were more credible than appellant and those witnesses who testified on his behalf. There was substantial evidence which, if believed, was sufficient to convict appellant on all three offenses.

Appellant's sixth assignment of error is not well taken and is overruled.

Based on the foregoing, appellant's first, second, third, fourth, fifth, and sixth assignments of error are overruled and the judgment of the Franklin County Court of Common Pleas is hereby affirmed.

*Judgment affirmed.*

MCCORMAC and PEGGY BRYANT, JJ., concur.