OPINION
Defendant-Appellant Anthony Ginyard appeals his convictions for rape, gross sexual imposition, and kidnapping, the last of which carried a sexual motivation specification and a sexually violent predator specification. In his two assignments of error, Ginyard claims his convictions were against the manifest weight of the evidence and that his trial counsel's assistance was unconstitutionally ineffective. In addition, we granted the State's motion requesting leave to appeal the trial court's July 9, 1998 termination entry which merged Ginyard's kidnapping and rape convictions. We consolidated the two appeals and converted the State's appeal into a cross-appeal in a September 2, 1998, decision and entry. In its sole assignment of error, the State argues that the trial court erred in finding kidnapping to be an allied offense of similar import to rape under the circumstances of this case.
The record reveals that in February of 1998, Ginyard was employed by the Miami Valley Regional Transit Authority (hereinafter "RTA"), which operates a transportation service for disabled individuals under the moniker of Project Mobility. Ginyard's responsibilities included assisting those individuals incapable of boarding the Project Mobility vans into the vehicle, securing them in seat belts or their wheelchairs to the van, and helping them off the van and to their destinations.
The victim in this case, Ebony Davis, has cerebral palsy and is borderline mentally retarded, and was employed at the Belmont Thrift Shop at 718 Watervliet Avenue in Dayton, which is operated by United Cerebral Palsy. Davis lives at Arbor House which is a group home for individuals with mental and/or physical challenges such as cerebral palsy, spina bifida, and mental retardation located at 2205 Wesleyan Drive in Dayton. Davis has great difficulty walking, and wears leg braces under her clothing to help stabilize her legs and keep her from falling. Reading material designed for the fifth and sixth grade levels is challenging for Davis, and her mental age has been estimated to be in the 10- to 12-year-old range. At the time of trial, she was scheduled to graduate from Northridge High School on May 30, 1998.
On February 13, 1998, Ginyard was dispatched to Ebony Davis' home with instructions to transport her to her place of employment. According to the Project Mobility manifest for Ginyard, he picked Davis up at Arbor House at 11:10 a.m, and arrived at the thrift shop forty minutes later. These times, and the fact that Ginyard was Davis' driver on that trip, were not in dispute at trial, nor was the fact that Davis was Ginyard's only passenger during that time contested. Other manifests showed that the same trip took anywhere from fourteen to twenty-five minutes for other Project Mobility drivers to complete, with the average travel time being just more than nineteen minutes.
According to Davis, Ginyard asked her some personal questions such as whether she was engaged, what her age was, and whether she wanted to sit in the front of the van with him. Davis declined, and sat in the back of the van. Rather than taking her directly to the thrift shop, however, Davis testified that Ginyard took her to his apartment located at 2133 Ravenwood Avenue in Dayton, which she described as the left side of a pink duplex. After asking Davis if she wanted to go in with him and receiving a negative reply, Ginyard "yanked" Davis from the van and took her into the apartment through the back door. Davis correctly testified that the back yard had cement stepping stones next to a storage building, and that there was railing at the left side of the back steps to the apartment. Davis told Ginyard she did not want to go in, but he "yanked" her into the apartment and took her through the kitchen into the living room.
Davis testified, again correctly, that the living room was furnished with a black leather couch and a matching "long chair" or chaise, that there were tapes in one place on the floor, and that the carpet in the apartment was beige. Ginyard asked her if she wanted to sit or stand, and because she has difficulty standing for any length of time, Davis told him she preferred to sit. While she was sitting on the black couch, Ginyard left her sight for a couple of minutes, then returned, whereupon he kneeled down by her and began to pull her pants down. She resisted by holding onto her pants and telling him she did not want him to do that, but she lost her grip and Ginyard pushed her pants down to her knees. She continued to object as he touched her vaginal area with his hand. Next, Ginyard unzipped his pants and brought Davis to a standing position then laid her down on the couch and got on top of her. Davis testified that Ginyard was attempting to penetrate her vagina with his penis but was unsuccessful, so he stood her up again, sat down himself, then pulled her down onto his lap with her back to him. At that point, Davis stated, she could feel Ginyard's penis enter her vagina. Although she closed her eyes after seeing Ginyard unzip his pants, she testified that she knew he had taken his penis out of his pants because she felt it inside her vagina. Again, she told Ginyard she did not want to "do that," and tried to get off of him. After approximately four or five minutes, Ginyard stopped and Davis stood, went to the kitchen, and pulled up her pants. There she told Ginyard to just take her to the thrift shop. Instead, Ginyard pulled her sweatshirt tight around her so he could "check the size of my breasts," then touched her breast in spite of her protests that she already had a boyfriend and her efforts to pull away from him. Afterward, Ginyard took Davis out of the apartment through the back door, locked the door and walked her to the van. While doing so, he repeatedly told her not to tell anyone what had happened, and that God loves her. As he drove her to the thrift store, he continued to warn her not to tell, and she assured him that she would not say anything.
 Ginyard told a different story. He stated that after he picked Davis up at her residence, he made his way to the intersection of Tennyson and Salem Avenues where he encountered a traffic jam. Ginyard testified that he could not make his turn into the southbound lanes of Salem Avenue for approximately ten minutes, after which he looked back in his rear view mirror and saw emergency vehicles a couple of blocks behind him. An audio tape from the RTA dispatch center was played at trial and confirmed that at approximately 10:35, roughly forty minutes earlier, there had been an accident on Salem Avenue a few blocks north of where Ginyard turned onto Salem heading south. Ginyard testified that after he turned onto Salem Avenue, he proceeded to the thrift shop without further incident.
Once they arrived at the thrift store, Ginyard accompanied Davis into the building where he received a "payment ticket" for transporting Davis. Reva McElrath, programming aid for United Cerebral Palsy, was working at the store and testified that Davis remained by McElrath's desk after Ginyard turned to leave. McElrath commented to Davis that it was lunch time and that Davis could eat her lunch, but Davis continued to stand near McElrath's desk, breathing deeply. Davis looked over her shoulder, asked if "he" was gone, told McElrath she had something to tell her, then poured out her story to McElrath, who repeated it to her supervisor. Soon thereafter, JoLinn Engler, the manager of Arbor House, and the police were notified of Davis' allegations. Davis was transported to the emergency room of Miami Valley Hospital where a rape kit was prepared and Detective Theresa Lawson of the Dayton Police Department interviewed her. Reports from the Miami Valley Regional Crime Laboratory[1] showed that no semen or spermatozoa were detected in any of the samples taken from Davis or on the clothing she was wearing at the time of the sexual assault, nor were any pubic hairs similar to Ginyard's found in the pubic hair combing sample taken from Davis.
Sometime that afternoon, Ginyard was relieved of his duties and accompanied by a supervisor back to the RTA building where he was informed of Davis' allegations. Officer William Cory of the Dayton Police Department testified that upon learning of the allegations against him, Ginyard remained calm and relaxed, asked no questions, and did not appear surprised, but proclaimed his innocence. Officer Cory transported Ginyard to the police station where he was questioned further and eventually arrested on the charges as noted above.
On May 18, 1998, the jury returned guilty verdicts on all counts. Approximately one month later, Ginyard's trial counsel filed a motion to merge the offenses of kidnapping and rape, and the offenses of gross sexual imposition and rape. The trial court sustained the former, and denied the latter. On July 6, 1998, Ginyard was sentenced to a term of eighteen months of incarceration on the gross sexual imposition offense, and a term of ten years on the merged kidnapping and rape offenses, to be served consecutively. Ginyard was also determined to be a sexual predator pursuant to R.C. § 2950.09(B).
Ginyard's first assignment of error states as follows:
 The trial court erred in that the conviction of Mr. Ginyard was against the manifest weight of the evidence[.]
Preliminarily, we note that in weight of the evidence challenges, an appellate court
 [R]eview[s] the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.
State v. Thompkins (1997), 78 Ohio St.3d 380, 387, quoting Statev. Martin (1983), 20 Ohio App.3d 172, 175. Although Thompkins
permits a reviewing court to consider the credibility of witnesses when addressing a weight of the evidence challenge, we nevertheless accord substantial deference to a factfinder's decision as to which testimony to credit, and to what extent to do so. State v. Lawson (Aug. 22, 1997), Montgomery App. No. 16288, unreported. In addition, although we have previously noted that in analyzing the weight of the evidence, "the appellate court can exercise a slightly broader standard [than in sufficiency of the evidence challenges] and assess, to a limited degree, the believability of the evidence presented," we are not unlimited in our authority to determine the credibility of witnesses postfacto. City of Fairborn v. Boles (May 15, 1998), Greene App. No. 97-CA-110, unreported. "This standard allows the reviewing court to judge the credibility of opposing opinion testimony, but not of fact testimony, unless it is so incredible that it defies belief."Id. Bearing this in mind, we proceed to the merits of Ginyard's assigned error.
In support of his argument that his convictions are against the manifest weight of the evidence, Ginyard directs our attention to State v. Mattison (1985), 23 Ohio App.3d 10, 14, where the guidelines or considerations to be taken into account when weighing the evidence were enumerated. Paraphrased, they are: (1) recognition that a reviewing court need not accept as true the incredible; (2) whether the evidence is uncontradicted; (3) whether a witness was impeached; (4) what was not proved; (5) the certainty and reliability of the evidence; (6) the extent to which any of the witnesses may have an interest to advance or protect by their testimony; and (7) the extent to which the evidence is vague, conflicting, fragmentary, or not fitting together in a logical pattern. Ginyard then claims that the fact that there was a traffic accident on Salem Avenue on the morning in question was uncontradicted, that Davis was impeached as a witness, and that the medical examination of Davis revealed no evidence that a rape had occurred. In addition, Ginyard argues that Davis' description of the rape was unreliable and uncertain, that as a mentally retarded individual, Davis was "more inclined to conjure up stories,"[2] and that the events described by Davis could not possibly have taken place in the time within which they were claimed to have occurred.
We find that the evidence in this case does not weigh heavily against Ginyard's convictions. On the contrary, in reviewing the entire record we find the inconsistencies Ginyard points out not to be of the type, number, or magnitude that would entitle him to a new trial. Even giving the jury's determinations of credibility reduced deference from that appropriate in, for example, a sufficiency of the weight challenge, there remains in the record enough evidence of Ginyard's guilt to preclude a finding that "the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction[s] must be reversed and a new trial ordered." Thompkins, supra. Moreover, we do not find the fact testimony produced by the State at trial to be so incredible as to defy belief. Boles, supra. Consequently, Ginyard's first assignment of error is overruled.
In his second assignment of error, Ginyard claims as follows:
 Mr. Ginyard was denied effective assistance of counsel as guaranteed by the United States and Ohio Constitutions[.]
In reviewing a claim of ineffective assistance of counsel, "[t]rial counsel is entitled to a strong presumption that his or her conduct falls within the wide range of reasonable assistance."State v. Cook (1992), 65 Ohio St.3d 516, 524, citing Stricklandv. Washington (1984), 466 U.S. 668, 687-89. The burden is with the appellant to satisfy the two-pronged test employed to determine whether he was accorded effective assistance of counsel at trial.Strickland, supra at 687; State v. Smith (1985),17 Ohio St.3d 98, 100. First the appellant must show that defense counsel's performance fell below the objective standard of reasonable representation. State v. Bradley (1989), 42 Ohio St.3d 136, paragraph two of the syllabus. Counsel's errors must constitute a "substantial violation of any of defense counsel's essential duties to his client." Id. at 141, quoting State v. Lytle
(1976), 48 Ohio St.2d 391, 396-97, vacated in part on other grounds, Lytlev. Ohio (1978), 438 U.S. 910. In addition, the error must be so egregious that the attorney "was not functioning as the `counsel' that the Sixth Amendment guarantees." Cook, supra at 524.
Showing such error, however, does not end the inquiry. The second step of the test requires an appellant to prove that there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. Strickland,supra at 694; Bradley, supra, paragraph three of the syllabus. In order to prevail on his assigned error, Ginyard must satisfy both prongs of the foregoing test.
In claiming he was denied effective assistance of counsel at trial, however, Ginyard mistakenly contends that the lab reports from the Miami Valley Regional Crime Laboratory were not presented to the jury during trial and that prejudice resulted therefrom. As we noted in footnote one, above, those lab reports were admitted into evidence as Joint Exhibits I and II, and were provided to the jury along with a third report to which Ginyard makes no reference. Therefore, even if we were to find that Ginyard's trial attorney's representation was defective for his failure to present testimonial evidence concerning the results of the lab reports, we could find no prejudice since the evidence was provided to the jury. The jury was properly instructed that the exhibits admitted during trial were evidence, and that it should consider all the evidence in making its findings. Nothing in the record suggests that the jurors did otherwise. We cannot say, therefore, that the result of Ginyard's trial would have been different had they been presented with the lab reports since those reports were in fact provided to them.
Ginyard also contends that his trial counsel was derelict in failing to request a new standard of pubic hair as was suggested in the Miami Valley Regional Crime Laboratory's report dated April 2, 1998. The laboratory's report dated May 8, 1998, however reflects that such a standard was submitted and that no pubic hair match resulted from the comparison of the samples from Davis and Ginyard. This, too, was evidence the jury had in its possession during their deliberations. Thus, we find neither error by Ginyard's trial attorney nor prejudice flowing therefrom.
For the foregoing reasons, Ginyard's second assignment of error is overruled.
The State asserts one assignment of error in its cross appeal, which reads as follows:
 The trial court erred in merging, over the State's objection, Appellant's convictions of kidnapping and rape.
 In its brief, the State argues that because Ginyard was convicted of engaging in sexual conduct with Davis, whose ability to resist or consent was substantially impaired because of a mental or physical condition, rather than engaging in that same conduct by force or threat of force, kidnapping is not an allied offense of similar import. Ginyard did not respond to the State's cross-appeal.
R.C. § 2941.25 governs merger of two or more offenses, and provides as follows:
 Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.
 Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.
The test for determining whether merger is appropriate requires engagement in a two-step analysis. State v. Jones
(1997), 78 Ohio St.3d 12, 13, citing State v. Blankenship (1988),38 Ohio St.3d 116, 117. In State v. Mughni (1987), 33 Ohio St.3d 65,67, the Ohio Supreme Court articulated the analytical framework for such inquiries as follows:
 The first step requires a comparison of the elements with which the defendant is charged, for the purpose of discovering whether the elements of both offenses correspond to such a degree that the commission of one offense will result in commission of the other. If so, they are allied offenses of similar import. If the court so finds, it must proceed to the second step, which involves a review of the defendant's conduct to determine whether the offenses were committed separately or with a separate animus as to each. If so, the defendant may be convicted of both. * * * The defendant bears the burden of establishing his entitlement to the protection, provided by R.C. 2941.25, against multiple punishments for a single criminal act.
Thus, we must first determine whether Ginyard's commission of the rape offense resulted in the commission of the kidnapping offense, or vice-versa.
Ginyard was found guilty of violating R.C. § 2907.02(A)(1)(c), which makes it a crime to engage in sexual conduct with another who is not the spouse of the offender when the other person's ability to resist or consent is substantially impaired because of a mental or physical condition, and the offender knows or has reasonable cause to believe that the other person's ability to resist or consent is so impaired. The jury also found him guilty of kidnapping pursuant to R.C. § 2905.01(A)(4) when he, by force, threat, or deception, removed Davis from the place where she was found or restraining her liberty for the purpose of engaging in sexual activity with her against her will. In comparing the elements of the two offenses, we do not find them to correspond to such a degree that the commission of one necessarily results in the commission of the other.
As the State correctly argues, force, threat, or deception are not elements to be proven under R.C. § 2907.02(A)(1)(c). Consequently, the offense of rape under that statute can be committed without also committing the offense of kidnapping under R.C. § 2905.01(A)(4) which does require the use of force, threat, or deception.
In the same vein, the offense of rape under R.C. § 2907.02(A)(1)(c) requires the State to prove that the victim's ability to resist or consent was substantially impaired by a mental or physical condition known to the offender or of which the offender had reasonable cause to believe was present. The same cannot be said of kidnapping under R.C. § 2905.01(A)(4).
The most that can be said of the similarity of the two offenses merged by the trial court is that they were apparently committed with common animus. Having found that the elements of the offenses fail to correspond to such a degree that the commission of one results in the commission of the other, however, we do not reach the question of whether they were committed separately or with a separate animus to each. Jones, supra;Blankenship, supra; Mughni, supra. We conclude the trial court erred in merging the offenses of rape and kidnapping and, accordingly, the State's sole assignment of error in its cross-appeal is sustained.
Having found Ginyard's two assignments of error to be without merit, they are overruled and his convictions are affirmed. The State's assignment of error is sustained, and we remand to the trial court for resentencing consistent with this opinion.
BROGAN, J. and WOLFF, J., concur.
Copies mailed to:
Carley J. Ingram
L. Patrick Mulligan
Hon. Barbara P. Gorman
[1] We note that on December 31, 1998, Ginyard's appellate counsel filed a motion with this court to modify the record to reflect inclusion of two lab reports from the Miami Valley Regional Crime Laboratory dated March 18, 1998, and April 2, 1998, respectively. In his attached memorandum, counsel described the reports as "new information" and claimed that Ginyard's trial counsel was deficient in not introducing or mentioning the "potentially exculpatory" evidence contained therein at trial. Appellate counsel further asserted that the reports were never brought before the trial court and consequently formed no part of the record. The State did not respond to the motion. Taking Ginyard's appellate counsel at his word, we rendered our February 2, 1998, decision and entry denying counsel's request stating that we cannot add material to the record before us which was not a part of the trial court's proceeding, then decide the appeal on the basis of the new matter, quoting State v. Ishmail (1978),54 Ohio St.2d 402, paragraph one of the syllabus. We further suggested to counsel that the issue might more appropriately be pursued in a petition for post-conviction relief since its resolution required reference to matter de hors the record. After meticulous scrutiny of the transcript and exhibits before us, however, we have discovered that the reports sought to be supplemented to the record were in fact introduced at trial and accepted into evidence as Joint Exhibits I and II. Transcript at 829, 879-80. In addition, we note that a third report from the Miami Valley Regional Crime Laboratory dated May 8, 1998, was also introduced as Joint Exhibit III. In any case, because the issue is in reality one of duplication rather than supplementation, our denial of Ginyard's motion to modify the record was ultimately the correct result.
[2] Ginyard's appellate counsel cites no authority for his suggestion that mentally retarded people as a class possess a propensity for untruthfullness, nor, we suspect, could he have. As such, we view counsel's statement as an expression of outdated and stereotypical thinking toward the mentally retarded which cannot form any part of the basis of our decision.