THE STATE OF OHIO, APPELLEE, *v.* MATTISON, APPELLANT.

(No. 48657 — Decided March 11, 1985.)

*John T. Corrigan,* prosecuting attorney, for appellee.

*Hyman Friedman,* county public defender, and *Marillyn Fagan Damelio,* for appellant.

PRYATEL, J. On June 2, 1983, Artis Mattison, defendant-appellant, was indicted by the Cuyahoga County Grand Jury for three counts of aggravated arson in violation of R.C. 2909.02.[1] The indictment alleged that the defendant "unlawfully and purposely and by means of fire or explosion, knowingly created a substantial risk of serious physical harm" to Jacqueline Stewart (Count I); Emma Stewart (Count II); and "to an occupied structure * * * to-wit: house located at 2939 East 81st St." (Count III) "by the use of a dangerous ord-

nance." On January 9, 1984, the cause came to be heard in the court of common pleas. On January 18, 1984, the jury returned a verdict of guilty as to each count of aggravated arson. On April 11, 1984, after the case was referred to the Cuyahoga County Probation Department for a pre-sentence report, defendant was sentenced to concurrent terms of four to twenty-five years on each count. Defendant filed a timely appeal on May 11, 1984.

At trial, the following evidence was disclosed. On April 26, 1983, a fire broke out at 2939 East 81st Street. Emma Stewart, who rented this property from defendant's mother, Queen Mattison, was living there at the time of the fire with her five daughters and four grandchildren. Defendant and his mother lived in the next house which was approximately three to five feet from where the Stewarts resided. On the other side of defendant's residence was a store (also owned by defendant's mother) where defendant worked the night shift.

The state's first witness, Lieutenant John Bergeine, who was an arson investigator employed by the Cleveland Fire Department, testified that on April 26, 1983 at 7:00 a.m. he and Lieutenant Richard A. Williams investigated the fire at 2939 East 81st Street and that he took various photographs of the scene of the fire which he identified and which were introduced into evidence. He further testified that the fire was started by a fire bomb (a bottle containing flammable liquid with a wick) and therefore was incendiary, rather than accidental, in nature. Lieutenant Bergeine noted

---

[1] R.C. 2909.02 provides in part:

"(A) No person, by means of fire or explosion, shall knowingly:

"(1) Create a substantial risk of serious physical harm to any person;

"(2) Cause physical harm to any occupied structure;

"(3) Create, through the offer or acceptance of an agreement for hire or other consideration, a substantial risk of serious physical harm to any person or of physical harm to any occupied structure."

that when he investigates a "fire bombing" (*i.e.,* a fire started by flammable liquid), he usually tries to collect at least a portion of the glass that was used to toss the fire bomb. However, he found that in this case, "it was difficult for me to pick up any kind of real evidence as far as the bottle that may have been used for this fire bombing because * * * in my estimation there was to [*sic*] much debris around."

In similar vein Lieutenant Williams indicated that the fire was incendiary and testified that there were two "points of origin" (immediate place where fire starts): one fire bomb had been thrown through the northeast corner of the downstairs kitchen window and another fire bomb was thrown through the upstairs bedroom window. Lieutenant Williams' conclusion that fire bombs had been used was based on the fact that there was "heavy charring * * * where the pattern of the liquid spilled" which showed that the fire spread on impact like an explosion; hence, it could not have been the result of a natural or electrical cause.

Lieutenant Williams further testified that at approximately 8:00 a.m. on the morning of the fire, he interviewed the Stewart family and defendant. When Lieutenant Williams asked defendant where he was at the time of the fire, defendant told him that he was managing the store.

Lieutenant Williams was later called by the state as a rebuttal witness, and was asked whether he had interviewed Queen Mattison, defendant's mother, in the course of investigating the fire. Lieutenant Williams replied affirmatively and said that defendant's mother told him that at the time the fire took place "she thought Artis might have been fooling around with some of the girls next door (Stewart's house) but she wasn't sure."

Jacqueline Stewart, age fifteen, the state's main witness, testified that on April 26, 1983 she had been sleeping on a couch in the dining room and woke up around 6:00 a.m. As she opened the door to the kitchen, she noticed that the kitchen window was broken and that a fire had started. Jacqueline immediately went into the living room, her mother's bedroom on the first floor and up the fire escape to the second floor to wake up her family. She noticed that another fire bomb was thrown through a window on the second floor.

As she was waking one of her sisters, who was sleeping in a room by the den, she testified that she leaned across her sister's bed, looked out the window and saw defendant. She said defendant was wearing a black coat with black pants and black shoes and that he was carrying a bottle in his hand. When Jacqueline saw defendant she screamed. She said defendant ran behind the house and went two doors away to his mother's store. On cross-examination, Jacqueline testified that after defendant went to the back of the house she saw him walk across the street. She further testified that the next time she saw defendant was at approximately 8:00 a.m. carrying a grocery bag, wearing blue jeans and a jean jacket.

On May 5, 1983, Detective Clifford Smith of the Arson Unit of the Cleveland Police Department took a statement from Jacqueline Stewart. Jacqueline recounted the events of April 26, 1983 as follows:

"On 4-26-83 I was in the den on the first floor of my house located 2939 E. 81 St. on the couch and I had just woke up and I walked into the kitchen and open the kitchen door *and I saw Artis Mattison throw a gas bomb into our kitchen window and break same and it landed on the kitchen table.* It started on fire, and then I ran back into the bedrooms to wake up the rest of the family, and I saw him with another fire bomb in his hand ready to throw it and then I screamed and then he ran into his

store which is a couple doors away from our house. I woke everybody up and my sister Janette called the fire department. After we all came out of my house I saw Artis Mattison going over to some ladies house across the street to changed his clothes. After the fire department come I saw Artis jumped over the ladies fence across the street and took off running." (Emphasis added.)

At trial on cross-examination, Jacqueline denied that she saw defendant throw the bomb into the kitchen, which was inconsistent with her written statement. The statement that she saw defendant go over to a lady's house across the street, change his clothes and jump across the fence was never challenged.

Jacqueline also testified that *three days before the fire,* on April 23, 1983, defendant put a "for sale" sign on their front' lawn. Defendant asked Jacqueline's mother to buy the house, but she couldn't afford it. Jacqueline said that she took the "for sale" sign off their lawn and defendant became angry and kicked their front door down. According to Jacqueline, defendant left the porch and began threatening her and her family as follows:

*"And he say, I get you all out here one way or another. He said, he will burn the house down and all this stuff."* (Emphasis added.)

Jacqueline's mother, Emma Stewart, testified that she did not hear defendant threaten her daughters on April 23, 1983, but she did hear him say "he was going to get some money or one of us or somebody was going to come up missing." She also testified that defendant was at their house one to two times a week and that he had insinuated that he wanted to take one of her daughters out for a date.

Insofar as the fire is concerned, Ms. Stewart said that Jacqueline had awakened her and after the fire was extinguished, she went back into the house. She said the house was full of garbage and smelled like kerosene and that the fire department found a broken bottle with a rag inside on the kitchen floor.

Defendant called four witnesses on his behalf. First, Square Gregory, who lived down the street from defendant for seven years, testified that on the day of the fire, he heard an explosion, looked out his window and saw two girls run to the back of their house. Approximately twenty to thirty minutes later, he said he saw defendant walking from Kinsman and East 81st Street toward the fire.

Second, Montine Thompson, another neighbor, testified that she saw two people run from the house that was on fire and that she did not leave her house that day and therefore did not see defendant.

Third, Queen Mattison testified that although she has poor eyesight, she saw her son, defendant, walking from Kinsman carrying a paper bag at the time the fire was being put out. On cross-examination she denied being interviewed by Lieutenant Williams on the morning of the fire.

Finally, defendant took the witness stand in his own behalf and stated that he was forty-two years old, and was convicted of bank robbery in 1974, and that he had lived at 2937 East 81st Street for thirty years. He testified that he was responsible for collecting the Stewarts' rent and that they were delinquent in their rent on several occasions.

Defendant's version of what happened on April 23, 1983 was as follows:

Defendant admitted that he placed a "for sale" sign on the Stewarts' front lawn, and then offered to sell the house to the Stewarts. The Stewarts became angry and slammed the door. Defendant started walking away from the house but when Jacqueline told him that she took the sign down, he walked back towards the door. The door hit him in

the head. He grew angry and kicked the door down.

Defendant denied any responsibility for the April 26, 1983 fire. In his unsupported alibi he said that he was working the night shift at his mother's store and left early that morning to buy beer at a store located about ten minutes away on Kinsman. His mother's store did not sell any alcoholic beverages. He further stated that he left a friend, Charles Pettaway (who did not testify), at his mother's store while he was away. Defendant admitted that he had never asked Charles Pettaway to watch the store before. After he bought some beer he walked down his street and noticed that the house the Stewarts rented from his mother was on fire. He then spoke with his mother and went back into his mother's store.

On cross-examination, defendant acknowledged that he was very familiar with the layout of the house that was burned down.

Appellant has raised a single assignment of error.

### Assignment of Error

"The verdict is against the weight of the evidence."

Appellant maintains that in weighing the evidence under the guidelines set forth in *State* v. *Gaston* (Jan. 11, 1979), Cuyahoga App. No. 37846, unreported, the jury's verdict must be reversed and the case must be remanded for a new trial. We disagree.

In *Gaston* we delineated the following factors as *guidelines* or *considerations* to take into account when weighing the evidence:

" '1. Knowledge that even a reviewing Court of Appeals is not required to accept as true the incredible. *E.g., Schaefer* v. *Cincinnati* (1945), 75 Ohio App. 288, 292 [31 O.O. 48].

" '2. Whether evidence is uncontradicted, *State* v. *Urbaytis* * * * [(1951), 156 Ohio St. 271 [46 O.O. 139] at 277.

" '3. Whether a witness was impeached, *State* v. *Urbaytis, supra* at 277.

" '4. Consideration of what was not proved, *Cole* v. *McClure* (1913), 88 Ohio St. 1, 14.

" '5. The certainty of the evidence, *Cole* v. *McClure,* [*Id.*]

" '6. The reliability of the evidence, *Cole* v. *McClure,* [*Id.*]

" '7. The extent to which any of the witnesses may have an interest to advance or protect by their testimony, *Cole* v. *McClure,* [*Id.*] and

" '8. The extent to which the evidence is vague, uncertain, conflicting, fragmentary, or not fitting together in a [logical] pattern, *Cole* v. *McClure,* [*Id.*] at 17.' " *State* v. *Payne* (App. 1978), 7 O.O. 3d 432, Jackson, J., dissenting, at 459.

Using these guidelines appellant argues that (1) it is *incredible* to believe that a landlord's son (appellant) would burn down his family's uninsured property; (2) the testimony of Jacqueline Stewart as to the identification of appellant is *contradicted* and *uncertain;* and (3) the evidence is *unreliable* since no physical or scientific incendiary device was found and the *evidence does not fit together in a logical pattern.*

A reviewing court cannot reverse a judgment of conviction in a criminal case where there is sufficient evidence presented to the jury " ' 'which, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt.' " *State* v. *Eley* (1978), 56 Ohio St. 2d 169, 172 [10 O.O.3d 340]; see, also, *State* v. *DeHass* (1967), 10 Ohio St. 2d 230 [39 O.O.2d 366]. In this case there is ample evidence upon which the jury could have based its verdict of guilty. The eight factors listed in *Gaston* are merely guidelines to be taken into account when weighing the evidence. They are not hard and fast rules which must be followed. Nevertheless, the jury's verdict that appellant is guilty would have to be sustained even under the *Gaston* factors.

Although it may be *unusual* for a landlord's son to burn down his family's uninsured property, it is not so unlikely as to be *incredible. Gaston* relied on the decision of *Schaefer* v. *Cincinnati Street Ry. Co.* (1945), 75 Ohio App. 288 [31 O.O. 48], for the proposition that a reviewing court need not accept as true the incredible. In *Schaefer,* plaintiff collided into a trolley bus at a rate of speed she estimated to be ten to twenty miles per hour. The court found that if plaintiff was driving at her highest estimate of speed (twenty miles per hour), it would have required the trolley bus to be travelling at one hundred miles per hour at the time of the collision. The court found this to be *incredible* and therefore refused to believe plaintiff. The instant case is a far cry from *Schaefer.* In *Schaefer,* it was impossible for the trolley car to be travelling at such a high rate of speed. However, it is not impossible for appellant to have started the fire in the instant case. Therefore, we need not disbelieve the state's theory.

Appellant also contends that Jacqueline Stewart's testimony as to the identification of appellant is inconsistent and therefore must not be believed. Jacqueline identified appellant as the arsonist in her testimony and in her written statement to Detective Clifford Smith. However, in her testimony Jacqueline initially said she saw appellant on her way back into the room where her sister and two children were, but later said she saw appellant as she leaned over her sister's bed. The second account is not necessarily inconsistent with the first, considering that Jacqueline, who was only fifteen years old, apparently had a difficult time communicating effectively, and was confronted with a situation that threatened the lives of her family. Jacqueline merely seems to be explaining in more detail where she was when she saw appellant. She never denied that she saw appellant — the only question was when.

Appellant also relies heavily on the fact that Jacqueline cannot be believed since she was impeached by her written statement which noted that she saw appellant throw the fire bomb into the kitchen. The discrepancy between what was contained in her written statement and what she testified to at trial bears on Jacqueline's credibility. However, credibility of witnesses is primarily for the trier of fact. *DeHass, supra,* at 231. It is obvious that the jury chose not to discredit all of Jacqueline's testimony concerning a fire about to engulf her home. Instead, the jury accepted that she identified appellant as the arsonist.

Appellant suggests that the lack of concrete physical evidence as to an incendiary device, when combined with the inconsistent testimony, means that there was no reliable evidence upon which the jury could base its verdict. We do not agree. The fact that no incendiary device was found is understandable, since it was consumed in the fire and mixed with the endless debris. Lieutenants Bergeine and Williams said that the fire was clearly incendiary in nature (based upon the charring patterns in the house) and was started by a "fire bomb" — testimony that was not contradicted. Moreover, Lieutenant Bergeine explained that the reason no incendiary device was found was because there was too much debris in the house. The fact that a fire bomb was used was substantiated by Square Gregory, one of defendant's witnesses, when he admitted that he heard an *"explosion"* at the time the fire started.

The fact that there were inconsistencies in the testimony merely places credibility in issue. There is sufficient evidence upon which the jury could base its verdict: *Just three days before the fire* appellant engaged in an argument with the Stewart family, kicked the door down, and threatened them. Moreover, since Jacqueline Stewart knew appellant she could easily recognize him from a few feet away (the distance between the house the Stewarts occupied and ap-

pellant's mother's house). Her testimonial identification of the appellant as the arsonist and the facts surrounding the fire provide ample evidence that supports the verdict of guilty.

Appellant's assignment of error is not well-taken.

The judgment of the trial court is affirmed.

*Judgment affirmed.*

PARRINO, P.J., and PATTON, J., concur.