OPINION
{¶ 1} This timely appeal comes for consideration upon the record in the trial court, the parties' briefs, and their oral arguments before this court. Defendant-Appellant, Tremaine Brown, appeals the decision of the Mahoning County Court of Common Pleas that found him guilty of murder with a firearm specification and sentenced him accordingly. Brown raises three issues on appeal.
 {¶ 2} First, Brown argues that his counsel was ineffective for asserting the affirmative defense of self-defense, rather than arguing accident, since that defense was clearly not supported by the evidence in the case. In order to prove ineffective assistance, Brown must show that counsel's performance was deficient and that he was prejudiced by that deficiency. In this case, counsel did not perform deficiently by asserting a self-defense theory and counsel's performance did not prejudice Brown, so counsel was not ineffective.
 {¶ 3} Second, Brown contends his conviction is supported by insufficient evidence. But Brown admitted that he killed the victim and there was sufficient evidence proving that he did so purposefully, thus his argument is meritless.
 {¶ 4} Third, Brown argues that his conviction is against the manifest weight of the evidence. But it does not appear the jury "clearly lost its way" when it concluded that Brown purposefully, rather than accidentally, killed the victim.
 {¶ 5} For these reasons, the trial court's decision is affirmed.
 Facts {¶ 6} At about 3:00 on the morning of June 18, 2003, Brown shot and killed his live-in girlfriend, Tawonna Thomas. Multiple witnesses saw him arguing with Thomas earlier that evening over his history of cheating on her and one witness claimed that Brown pointed a firearm at Thomas and "clicked it" minutes before he actually killed her. Brown admitted killing her, but alternately claimed that the shooting was an accident and that he acted in self-defense.
 {¶ 7} Brown was indicted for one count of murder with a firearm specification and the matter proceeded to a jury trial. At trial, Brown's counsel attempted to argue that Brown was acting in self-defense when he killed Thomas, rather than arguing that the shooting was an accident. However, the jury found Brown guilty of murder with a firearm specification. The trial court then sentenced Brown accordingly.
 Ineffective Assistance of Counsel {¶ 8} In his first assignment of error, Brown argues:
 {¶ 9} "Defense counsel's failure to present as a defense that was legally supported by the facts of the case denied Brown effective assistance of counsel in violation of the Sixth and Fourteenth Amendments of the United States Constitution as well as Article I, Section 10 of the Ohio Constitution."
 {¶ 10} In this assignment of error, Brown claims his counsel was ineffective for trying to defend using a theory of self-defense rather than by claiming that the shooting was an accident. According to Brown, the facts of the case do not support a theory of self-defense.
 {¶ 11} To prevail on a claim of ineffective assistance of counsel, a defendant must demonstrate counsel's performance was deficient and that deficient performance prejudiced the defense. Strickland v. Washington
(1984), 466 U.S. 668, 687. A properly licensed attorney is presumed to execute his duties in an ethical and competent manner. State v. Smith
(1985), 17 Ohio St.3d 98, 100. In order for a court to conclude counsel was ineffective, the defendant must overcome the strong presumption that, under the circumstances, the allegedly ineffective action might be considered sound trial strategy. Strickland at 698; State v. Sallie,81 Ohio St.3d 673, 674, 1998-Ohio-0343.
 {¶ 12} Ineffectiveness is demonstrated by showing that counsel's errors were so serious that he or she failed to function as the counsel guaranteed by the Sixth Amendment. State v. Hamblin (1988),37 Ohio St.3d 153. The defendant must demonstrate more than vague speculations of prejudice to show counsel was ineffective. State v. Otte,74 Ohio St.3d 555, 565, 1996-Ohio-0108. To establish prejudice, a defendant must show there is a reasonable possibility that, but for counsel's errors, the result of the proceeding would have been different. Strickland at 694. A reasonable possibility must be a probability sufficient to undermine confidence in the outcome of the case. State v. Bradley (1989), 42 Ohio St.3d 136, paragraph three of the syllabus. The defendant bears the burden of proof in demonstrating ineffective assistance of counsel. Smith at 100.
 {¶ 13} A decision regarding which defense to pursue at trial is a matter of trial strategy "within the exclusive province of defense counsel to make after consultation with his client." State v. Murphy,91 Ohio St.3d 516, 524, 2001-Ohio-0112. This court can only find that counsel's performance regarding matters of trial strategy is deficient if counsel's strategy was so "outside the realm of legitimate trial strategy so as `to make ordinary counsel scoff.'" State v. Woullard,158 Ohio App.3d 31, 2004-Ohio-3395, ¶ 39, quoting State v. Yarber
(1995), 102 Ohio App.3d 185, 188. Trial counsel's decision to pursue a theory of self-defense in this case does not meet this standard.
 {¶ 14} Self-defense is an affirmative defense. State v. Jackson
(1986), 22 Ohio St.3d 281. This defense does not merely deny or contradict the evidence offered by the State, but rather admits the prohibited conduct while claiming that surrounding facts or circumstances justify the conduct. State v. Grubb (1996), 111 Ohio App.3d 277, 282. The burden of going forward with the evidence of the affirmative defense of self-defense and burden of proof rests entirely upon Davis. R.C.2901.05(A); Jackson at 281.
 {¶ 15} A person asserting self-defense must show the following three elements: 1) that he was not at fault in creating the situation giving rise to the affray; 2) that he had a bona fide belief that he was in imminent danger of death or great bodily harm and that his only means of escape from such danger was in the use of such force; and, 3) that he did not violate any duty to retreat or avoid the danger. State v. Robbins
(1979), 58 Ohio St.2d 74, paragraph two of the syllabus. In a criminal case, the proper standard for determining whether a defendant has successfully raised an affirmative defense is to inquire whether the defendant has introduced sufficient evidence which if believed would raise a question in the mind of a reasonable person concerning the existence of such issue. State v. Palmer (1997), 80 Ohio St.3d 543, 564, 1997-Ohio-0312. If the defendant fails to prove any one of the elements of self-defense, then he fails to demonstrate that he acted in self-defense. Jackson at 283.
 {¶ 16} In this case, the facts arguably support a theory of self-defense. According to Brown's version of events, Thomas threatened to kill Sharpe, grabbed a gun, and walked out to her car. Brown introduced evidence showing Thomas had a history of shooting at him and Sharpe when they were together and chased him down the street one time while brandishing a firearm. He followed her into the car and tried dissuading her from killing Sharpe. She argued and did not notice dropping the gun. Brown grabbed the gun, got out of the car, and told Thomas that he had her gun. She told him that she had another and reached for something. He believed it was another gun and that she would use it to kill him, so he shot her as a "reflex."
 {¶ 17} This version of events is the version viewed in the light most favorable to a theory of self-defense. Brown's statements to the police and the testimony of other witnesses conflict with portions of this version of events. But this is the version of events Brown testified to at trial. Arguably, it supports a theory of self-defense. Arguably, he was not at fault for creating the situation at the car; he allegedly was trying to keep Thomas from killing Sharpe. He also claimed that he believed that Thomas was grabbing a gun to shoot him. Finally, he arguably did not have a chance to flee at the time of the deadly confrontation. There may be questions about both Brown's credibility and whether the jury would find that his version of events met all the elements of self-defense, but the issue was at least arguable. Thus, counsel's strategic decision to pursue a self-defense theory was not so unsound that ordinary counsel would scoff at his decision.
 {¶ 18} As importantly, it does not appear that Brown was prejudiced by counsel's actions, even if those actions were deficient. Since Brown admitted killing Thomas, his counsel's only choices were to argue that the killing was either accidental or in self-defense. As will be addressed below, the State introduced sufficient evidence proving that Brown murdered Thomas and that the murder was no accident. Brown's speculation that the defense would have introduced other evidence if he had pursued an accident defense is just that, speculation, and best left to post-conviction proceedings. Given the evidence in this case, it is unlikely that Brown's counsel would be able to successfully demonstrate either that the killing was an accident or that Brown acted in self-defense. Thus, Brown was not prejudiced by his counsel's decision to assert a theory of self-defense.
 {¶ 19} Counsel's strategic decision to pursue a theory of self-defense was not unsound, given the circumstances of this case. Furthermore, Brown was not prejudiced by his counsel's decision. Accordingly, Brown was not denied the effective assistance of counsel. Brown's first assignment of error is meritless.
 Sufficiency of the Evidence {¶ 20} Brown next challenges the weight and the sufficiency of the evidence, which we will address in the reverse order in which he raised them. In his third assignment of error, Brown argues:
 {¶ 21} "The State failed to produce sufficient evidence to prove that Brown was guilty of murder as alleged in the indictment. Brown's conviction thus violated due process."
 {¶ 22} Brown was convicted of murder in violation of R.C. 2903.02(A), which provides that "[n]o person shall purposely cause the death of another or the unlawful termination of another's pregnancy." Brown admitted he shot and killed Thomas. So on appeal he is only challenging the sufficiency of the evidence proving that he did so purposefully.
 {¶ 23} "Sufficiency of the evidence" is "`a term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law.'" State v. Thompkins, 78 Ohio St.3d 380,386, 1997-Ohio-0052, quoting Black's Law Dictionary (6 Ed .1990) 1433. The relevant inquiry when determining whether the evidence is sufficient to support the verdict "is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." State v. Jenks (1991), 61 Ohio St.3d 259, paragraph two of the syllabus. "The verdict will not be disturbed unless the appellate court finds that reasonable minds could not reach the conclusion reached by the trier of facts." Id. at 273. Whether the evidence is legally sufficient is a question of law. Thompkins at 386.
 {¶ 24} R.C. 2901.22 defines the various culpable mental states used in Ohio's criminal statutes. It provides:
 {¶ 25} "A person acts purposely when it is his specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is his specific intention to engage in conduct of that nature." R.C. 2901.22(A).
 {¶ 26} Thus, to convict Brown of murder, the State had to prove that he specifically intended to cause Thomas' death.
 {¶ 27} A defendant's intent can never be proved by the direct testimony of a third person; it is almost always proven by circumstantial evidence. State v. Lott (1990), 51 Ohio St.3d 160, 168. This does not pose any fundamental problems since "[c]ircumstantial evidence and direct evidence inherently possess the same probative value and therefore should be subjected to the same standard of proof." Jenks at paragraph one of the syllabus. "The intent to kill * * * may be deduced from the surrounding circumstances, including the means or weapon used, its tendency to destroy life if designed for that purpose, the manner in which the wounds are inflicted, and all other facts and circumstances in evidence." State v. Simpson, 10th Dist. No. 01AP-757, 2002-Ohio-3717, 93, citing State v. Robinson (1954), 161 Ohio St. 213, 218-219. In this case, it appears there is sufficient circumstantial evidence supporting the jury's conclusion that Brown purposefully caused Thomas' death.
 {¶ 28} All the witnesses agreed that Thomas and Brown had a fight that night. Pamela Jefferson said she heard Brown talking to Thomas through the bedroom door and heard Thomas tell Brown to leave her alone. Tiara Johnson testified that she heard Brown and Thomas talking upstairs before Brown came down saying, "Thomas doesn't want me up there." Charity Brady stated that Brown was acting differently that night and that Brown was pressuring Thomas to have sex with him, but that Thomas refused. And Thomas' brother, Claude, testified that Brown and Thomas were arguing and that Thomas told Brown to leave her alone. Brown himself testified that earlier in the day Thomas found out he was cheating on her and was very angry with him. He testified that she was still mad at him that night.
 {¶ 29} All the witnesses also agreed that Thomas eventually emerged from her room, wearing only a robe and wrapped in a blanket. Johnson and Brady both testified that Thomas said she was going to sleep in her car. Brady also stated that as Thomas was walking outside, she saw Brown pull out a gun and point it at Thomas. She testified that the gun clicked, but that it did not fire. Brown then looked at the gun and put it behind his back. Before Brown walked outside behind Thomas, Brady also heard him say, "This bitch is acting stupid, and I'm about to act stupid right along with her." Brown then followed Thomas outside and, after a few minutes, shot her.
 {¶ 30} This evidence is sufficient to support a conclusion that Brown specifically intended to cause Thomas' death. He was arguing with her soon before killing her. He pointed a gun at her and clicked it minutes before actually shooting her. And Brown stated that he was about to "act stupid" right before he shot Thomas. There is sufficient evidence proving each element of the offense. Brown's arguments to the contrary are meritless.
 Manifest Weight {¶ 31} In his second and final assignment of error, Brown argues:
 {¶ 32} "Brown's conviction for murder is against the manifest weight of the evidence."
 {¶ 33} Relying on the factors set forth in State v. Mattison (1985),23 Ohio App.3d 10, Brown states that the jury erred when it concluded that he killed Thomas purposefully, rather than accidentally. In support of his argument, he points to the witnesses who thought he was "just playing" when pointing a gun at Thomas and his characterization of the shooting as accidental in a letter written before he was arrested.
 {¶ 34} When reviewing a manifest weight claim, this court's role is to examine whether the evidence produced at trial "attains the high degree of probative force and certainty required of a criminal conviction."State v. Getsy, 84 Ohio St.3d 180, 193, 1998-Ohio-0533. To do this, a reviewing court must sit as the "thirteenth juror' and examine the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether the jury "`clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" Thompkins at 387, quoting State v. Martin (1983) 20 Ohio App.3d 172, 175. "`The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.'" Id. at 387, quoting Martin at 175.
 {¶ 35} Mattison provides guidelines a court can use when reviewing whether a factual finding is against the manifest weight of the evidence.
 {¶ 36} "In determining whether the decision of a trial court is against the manifest weight of the evidence, the following factors are guidelines to be taken into account by the reviewing court:
 {¶ 37} "1. The reviewing court is not required to accept as true the incredible;
 {¶ 38} "2. whether the evidence is uncontradicted;
 {¶ 39} "3. whether a witness was impeached;
 {¶ 40} "4. what was not proved;
 {¶ 41} "5. the certainty of the evidence;
 {¶ 42} "6. the reliability of the evidence;
 {¶ 43} "7. whether a witness' testimony is self-serving;
 {¶ 44} "8. whether the evidence is vague, uncertain, conflicting or fragmentary." Id. at syllabus.
 {¶ 45} The State claims we should refuse to follow Mattison since its guidelines would force this court to determine the credibility of the witnesses. However, in Thompkins the Ohio Supreme Court specifically stated that this court should, among other things, "consider the credibility of witnesses" when reviewing a manifest weight argument. Id. at 387. Thus, Mattison does not create a new standard to be applied to manifest weight claims; it merely lists guidelines to be considered when weighing the evidence. State v. Harris (Apr. 10, 1998), 11th Dist. No. 96-T-5512. We will follow those guidelines in appropriate situations, but are not bound to do so.
 {¶ 46} The State presented fourteen witnesses in its case-in-chief. The first witness was Thomas' husband, Yeraldine Thomas. He testified that he and Thomas were separated at the time of the murder, but had plans to reconcile. He saw her at her mother's house at about midnight on the night she died and they talked about getting back together. Thomas then left to get cigarettes for her mother and after returning left again with her little brother, Claude Fisher, to return to the apartment she shared with Brown. Finally, he testified that Thomas would drink "on occasion", that she took medication for emotional problems, that he never saw Thomas with a firearm, and that she never got physical when arguing with him.
 {¶ 47} Sabrina Fisher, Thomas' mother, testified next. She testified that Thomas suffered from postpartum depression after her second child and that this led to Thomas' separation from her husband, but that Thomas and her husband were reconciling their differences. She admitted that Thomas had a temper, but said she was taking medication to control her depression. Mrs. Fisher also said that Thomas came to her house at about midnight on the night she died. She denied that Thomas had anything to drink at her house and confirmed that Thomas ran out to get some cigarettes for her. After she returned with the cigarettes, she left with her brother. She had seen Thomas with a firearm before.
 {¶ 48} A couple of weeks after Thomas was killed, Mrs. Fisher received a letter from Brown. In that letter, Brown apologized to Mrs. Fisher and her family for the "traumatic accident."
 {¶ 49} Pamela Jefferson was the first of the girls who were present that night to testify. Jefferson was a minor who knew Thomas and Brown through her cousin, Thomas' best friend. On the night Thomas died, Thomas picked her, Tiara Johnson, and Charity Brady up and took them to her apartment. The girls were all planning on spending the night there. After they arrived, Jefferson, Johnson, and Brady went to a party down the street from Thomas' apartment, but returned shortly. Thomas and Brown stayed at the apartment, drinking gin. After the girls returned, Brown started a pornographic videotape. Jefferson walked outside with Johnson and did not watch the tape. When she walked in ten or fifteen minutes later, the tape was no longer on. She did not hear Thomas and Brown arguing when she came back inside and went upstairs to sleep.
 {¶ 50} As Jefferson lay in bed upstairs, she heard Brown come upstairs and ask Thomas to fix the cable. Thomas told him how to fix it, but wouldn't open her door for Brown. Then Jefferson heard Thomas say, "Leave me alone. Quit messing with me." She then heard Brown go back downstairs. The next thing she heard was a gunshot. She went downstairs after she heard people screaming and calling for her. When she went downstairs, she saw Thomas lying on the ground. Thomas was only wearing a bra and a robe and had a blanket on her. Finally, Jefferson testified that Thomas did not drink a lot that night, that she never saw Brown with a firearm that night, and that she never saw Thomas get a firearm out.
 {¶ 51} The State next called Johnson. She was also a minor and confirmed that Thomas picked the girls up so they could spend the night at her apartment. After the girls got to Thomas' apartment, they went down the street to a party, and then came back to Thomas' home. Close to midnight, Thomas left to bring her little brother to the apartment. She asked Brown to go with her, but he refused. After Thomas left, Brown went outside through the back door and shot a firearm twice.
 {¶ 52} When Thomas returned, Brown followed her to the kitchen in the back of the apartment and talked to her. The two moved upstairs and Tiara heard Brown talking to Thomas about the fixing the cable, so she fixed it herself. Brown came downstairs and said, "Tawonna don't want me up there," but he went upstairs again. Thomas and Brown fought and Thomas came downstairs, wearing a robe and covered in a blanket. Johnson did not see Thomas carrying a firearm and had never seen her with one. Thomas said she was going outside to sleep in her car. She didn't have keys in her hand, but generally left her car unlocked. Brown followed her outside. Johnson also did not see Brown carrying a firearm.
 {¶ 53} Shortly after Thomas and Brown went outside, Johnson heard a gunshot. Brown then came inside, went upstairs, and grabbed car keys. When Brown came back inside, Johnson saw something, possibly a gun, hanging from his pants. He then put on his shoes while coming back downstairs. After Brown went back outside, Johnson went to the door and saw Brown dragging Thomas from the front seat of her car. She first thought that Brown and Thomas were just acting like he shot her, but then Brown pulled the blanket over her face, got in the car, and drove away. She went outside and saw that Thomas was shot and bleeding.
 {¶ 54} Finally, Johnson testified that both Thomas and Brown were drinking that night. She further stated that she had seen Thomas chasing Brown down a street while naked and brandishing a firearm during a previous fight.
 {¶ 55} Brady, another minor, was the last of the three girls to testify. She also confirmed that Thomas brought her and the other girls to the apartment that night. Brady said that Thomas bought a bottle of gin before heading back to her apartment. She dated Thomas' brother at the time and urged Thomas to bring her brother to the apartment that night. Thomas agreed to do so and left.
 {¶ 56} Brady testified that Brown was "acting cool when everyone got to the apartment," but that he was acting different after Thomas left to pick up her brother. Thomas asked Brown if he wanted to ride along and he refused. After she left, Brown picked up a firearm from under the couch, put it in his pocket, and went to the backyard, where he shot the firearm two or three times. Then, after Thomas got back, she sat down with Thomas' brother, Thomas, and Brown to watch a pornographic videotape. After the movie, she went upstairs with Thomas' brother to "lay down" with him.
 {¶ 57} The two couldn't "lay down" because Brown came upstairs and was arguing with Thomas. Thomas would not go downstairs to fix the cable and would not let Brown in the room so he could have sex with her. According to Brady, the two argued "for a while", so she and Thomas' brother went back downstairs. After they came downstairs, Brown followed Thomas downstairs. Thomas said she was going to sleep in the car and was wearing a robe. Brown had a firearm in his hand and pointed it at Thomas. The firearm "clicked", but did not fire. Thomas, who was visibly angry, then walked outside. Brown said, "This B is acting stupid and I'm about to act stupid right along with her," and walked outside. Brady was not scared at the time because she thought Brown and Thomas were just "playing around."
 {¶ 58} Brady saw Brown standing outside the car talking to Thomas, who was sitting down inside the car. She stopped watching Brown and Thomas, but then heard a gunshot. Brady looked outside and saw Brown running inside. He ran upstairs and put his shoes on while running back down. Brown then went back outside, pulled Thomas out of the car, started the car, and drove away.
 {¶ 59} On cross-examination, Brady admitted that she had seen Thomas and Brown argue before that night and that Thomas had been drinking that night. She also said that she assumed the safety was on when the firearm clicked, but didn't fire.
 {¶ 60} Claude Fisher, Thomas' brother, testified next. He was at his mother's house that evening when Thomas stopped by after work. She seemed tired, but in a good mood. Fisher went with Thomas to get cigarettes for their mother and then went to her apartment with her. After they arrived, he went to the party down the street with the girls for about half an hour. He then came back to Thomas' apartment and watched television. Brown and Thomas were the only people drinking. After watching a pornographic movie, he went upstairs with Brady and "laid down." Fisher could hear Brown and Thomas arguing, but couldn't hear many specifics. He did hear Thomas say, "No. Leave me alone."
 {¶ 61} After a while, Fisher went back downstairs because the two were arguing. While he was in the kitchen, Fisher heard Thomas come downstairs and go outside, wrapped in a blanket. A few minutes later, Fisher heard a gunshot. He was under the impression that Thomas had a firearm on her when she went outside since he knew that she owned a firearm, but he had not seen Thomas' firearm that night. Fisher figured that Thomas shot the firearm in the air to scare off Brown since he knew she had done so before. Fisher also testified that he had seen a firearm in Brown's hands that night, that he heard Brown fire that weapon, and that he had never seen Brown put the firearm down.
 {¶ 62} After the gunshot, Fisher heard Brown come back into the house and go upstairs. Minutes later, he came back down and went back outside. Brady and Johnson then told him that Thomas was shot. He saw her laying on the street, covered only by a blanket.
 {¶ 63} Officer Joshua Kelly testified that he was on patrol in Youngstown that night when he was called to the scene of the shooting. He and his partner, Officer Randy Miller, were the first law enforcement officers to arrive at the scene. They saw a female lying in the middle of the street, so they secured the scene and called an ambulance. Nevertheless, Officer Kelly felt that the gunshot appeared to be fatal.
 {¶ 64} Officer Miller confirmed that he and Officer Kelly were the first officers on the scene. He saw Thomas lying in the street in a pool of blood, so he helped secure the scene and spoke with the witnesses. He also believed that Thomas' wound looked severe.
 {¶ 65} Officer John Patton worked in the Youngstown Police Department's Crime Lab. He was called out to the scene of Thomas' shooting to collect evidence. His testimony mainly just identified the State's various exhibits. Officer Robert Mauldin also testified. He assisted Officer Patton in processing the crime scene.
 {¶ 66} Detective David Lomax testified next. This case was his first homicide case and he was assisting Detective Gerald Maietta. He and Detective Maietta brought the witnesses back to the station so they could be interviewed and their statements videotaped.
 {¶ 67} Detective Maietta confirmed that Detective Lomax was assisting him in this case. He said that he heard that Thomas passed away before he left the scene that night. Detective Maietta also confirmed that he and Detective Lomax interviewed the witnesses and that each of them identified Brown as the shooter.
 {¶ 68} Detective Maietta testified that Brown was arrested on June 23rd, five days after he killed Thomas. When Detective Maietta first met Brown, Brown had a note written to the news media admitting he shot Thomas and explaining his involvement in the shooting. That note said that the shooting was "an accidental reflex action" and was generally consistent with Brown's description of events, which will be specifically set forth below. Detective Maietta did not believe that this statement was ever broadcast by the local media.
 {¶ 69} Dr. Robert Belding works for the Mahoning County Coroner's Office and performed the autopsy on Thomas. He said that there was alcohol in Thomas' urine and that she died as the result of a gunshot wound to her head.
 {¶ 70} Dr. Amanda Jenkins reviewed the toxicology results from Thomas' autopsy. She stated that the only medication in Thomas' system at the time of her death was Benadryl. She also believed that Thomas' blood alcohol content was over twice the legal limit for driving an automobile.
 {¶ 71} Brown called three witnesses to testify. Brown's first witness was Sharpe. She had two children with Brown, had known him for nine years, and said that Thomas had threatened her on more than one occasion. On the first occasion, Sharpe was visiting a friend's home when Brown and Thomas pulled up to a different home on the street. Brown saw Sharpe, the mother of two of his children, and went over to talk to her. Thomas told Brown to come back and to "get out of [Sharpe's] face." Brown continued talking to Sharpe, so Thomas went into her friend's house and came out with a handgun. She then pointed and fired the weapon at Sharpe and Brown. Sharpe and Brown ran away, then Brown went back over to Thomas and reconciled with her. Sharpe then went inside her friend's house. Sharpe further testified that Thomas would make snide remarks whenever they saw each other. According to Sharpe, Thomas acted this way because Brown cheated on Thomas with Sharpe on more than one occasion.
 {¶ 72} Sharpe also told of an incident which occurred on the day of the shooting. Thomas suspected Brown of cheating again, so she had Brown call Sharpe and ask questions about their relationship. After Thomas heard the conversation between Brown and Sharpe, Thomas told Sharpe "that she was going to kill me, him, and the kids." Sharpe heard Brown and Thomas arguing, then the line hung up. Sharpe never told the police about any of Thomas' threats or actions.
 {¶ 73} Brown next called Nichole Caesar to the stand. She also had two children with Brown and had "incidents" with Thomas. Caesar said that she was still "messing with" Brown when he was seeing Thomas, that Thomas found out, and that she "pulled out a handgun on [Caesar]." Caesar also did not report this incident to the police.
 {¶ 74} Finally, Brown testified on his own behalf. At the time of Thomas' death, he and Thomas were living together. One of the reasons they moved in together is that Thomas told him that her second child was his, although this was untrue. They had been a couple when they were younger, but after they broke up the first time, Brown began seeing both Sharpe and Caesar.
 {¶ 75} Brown testified that Thomas was generally a loving person, but that problems would develop if Thomas did not take the medicine prescribed for her depression. According to Brown, she stopped taking her medication two to three months before he killed her because she was no longer eligible for free medication. After Thomas stopped taking her medication, "she was a different person" and the couple would always argue. Those arguments would sometimes escalate into violent fights where Brown would feel physically threatened. Brown described one such incident.
 {¶ 76} According to Brown, he and Thomas had company over to their apartment. He and Thomas were upstairs and he wanted to go downstairs to entertain the guests. Thomas wanted to stay upstairs and physically restrained Brown by locking her arms and legs around him. They got into a physical fight and he ended up going downstairs to get away from her. When they were downstairs, someone passed a lighted cigar to Thomas over the head of Brown's little brother. Brown moved the cigar so it would not fall on his brother. Thomas responded by pulling a handgun and hitting Brown on the head with it. Brown ran outside and Thomas chased him, brandishing the weapon. According to Brown, two people tried to restrain Thomas from chasing him, but she ripped herself from the robe she was wearing and chased him down the street naked. Brown says the reason she did not shoot him that day is that the firearm had a faulty trigger and would not fire. Brown said this was one of four different handguns that Thomas owned.
 {¶ 77} Brown next confirmed Sharpe's story of how Thomas fired at the two of them with a handgun. He said that he went over to talk to Sharpe, that he did not remember the conversation, and that he did remember that Thomas shot at the two of them.
 {¶ 78} Brown also confirmed that Thomas had him call Sharpe on the morning of the day she died. According to Brown, Thomas said she had a dream, wrote down a list of questions, and wanted Brown to call Sharpe to ask her those questions. The questions involved things only Brown and Sharpe could know, like when was the last time the two of them had had sex. Brown called Sharpe and Thomas listened to the exchange on an extension. After Thomas got the information she needed, she interrupted and got into an argument with Sharpe. Then she got into an argument with Brown before he dropped her off for work.
 {¶ 79} Brown believed that Thomas was still upset with him when he picked her up from work. Thomas also seemed tired, but wanted to drink. So after coming back to the apartment, Thomas went to pick up Jefferson, Johnson, and Brady. When they all arrived back at the apartment, they had a bottle of gin and everyone was drinking. Later, the girls went to a party across the street while he and Thomas stayed at the apartment talking and being "smart" with each other. When the girls came back from the party, they asked Thomas to pick up her little brother. She agreed and asked Brown to come with her, but he refused. He also claimed the two of them had sex before she left.
 {¶ 80} Brown said that Thomas had a firearm on her person when she picked up the girls and that he found that weapon when everyone else was hanging out, waiting for Thomas to return. He took the gun into the backyard and shot it until it was unloaded, about eight times. He said he did this because of Thomas' past history. He then came back inside, went upstairs, and hid the firearm underneath the mattress.
 {¶ 81} When Thomas returned everyone came back inside and Thomas started a pornographic video. Thomas and Brown then went upstairs to talk about him cheating on her with Sharpe. According to Brown, Thomas was "trippin'" and claimed that she would shoot Sharpe. She then locked Brown out of the bedroom. He knocked on the door, asking for a pillow and a blanket so he could sleep downstairs. She gave him two pillows, but no blanket, was still arguing with Brown, and continued to say she would shoot Sharpe. Thomas said she was tired of Brown cheating on her, that it was too stressful, and that she regretted leaving her husband for him.
 {¶ 82} After that exchange, Thomas headed downstairs and Brown followed her. He told her she was "trippin'" and she walked out the door, wearing only a robe. He believed she was serious about shooting Sharpe. He followed her outside and, after she got in the front seat of her car, he climbed into the back seat. As they argued in the car, she dropped a handgun. He picked it up and quickly got out of the car. Brown told Thomas that she could not shoot Sharpe now since he had her weapon. Thomas said, "That ain't the only gun I got," and reached down. Brown said he was scared and pulled the trigger as a reflex.
 {¶ 83} After Brown shot Thomas, he pulled her out of the car, ran inside, grabbed his shoes, and left. He then hid out for a few days until found by the police while hiding in one of Sharpe's closets.
 {¶ 84} Given these facts, we cannot say the jury clearly lost its way when it concluded that Brown purposefully, rather than accidentally, killed Thomas. The most compelling evidence was that given by Brady, who testified that Brown pointed a handgun at Thomas and clicked it before following her outside and then said he was going to do something "stupid." This version of events is wholly incompatible with Brown's version of events and there is more reason to doubt the credibility of Brown's self-serving statements than Brady's testimony. Brown's second assignment of error is meritless.
 Conclusion {¶ 85} Each of Brown's assignments of error is meritless. Counsel did not perform deficiently by asserting a self-defense theory instead of arguing that the shooting was an accident. Furthermore, counsel's performance did not prejudice Brown. The State introduced sufficient evidence supporting each element of the offense. And, finally, Brown's conviction is not against the manifest weight of the evidence. Accordingly, the judgment of the trial court is affirmed.
Donofrio, P.J., concurs.
Vukovich, J., concurs.