OPINION
{¶ 1} This timely appeal comes for consideration upon the record in the trial court, and the parties' briefs. Defendant-Appellant Roderick Dixon appeals the decision of the Youngstown Municipal Court, which found him guilty of domestic violence, in violation of R.C. 2919.25(A). He was found not guilty of child endangerment and cruelty to animals.
 {¶ 2} On appeal, Dixon argues that his conviction was based on insufficient evidence and was against the manifest weight of the evidence. Because we conclude that the verdict was supported by legally sufficient evidence and was not against the manifest weight of the evidence, we affirm the decision of the trial court.
 Facts {¶ 3} On March 31, 2007, the Youngstown Police were called to 573 Sherwood Avenue on a report of a female being beaten by a male. There the police encountered Dixon, Melinda Hamlett, and Hamlett's two daughters. Upon the officers' assessment of the incident, Dixon was arrested and charged with domestic violence, child endangering, and cruelty to animals.
 {¶ 4} According to Hamlett's testimony, she and her two daughters had resided with Dixon at 573 Sherwood Avenue for approximately one to two weeks. They resided with Dixon at multiple other residences over the course of five years, with a six month gap from August 2006 to February 2007. Dixon paid the bills for the house on Sherwood, and Hamlett paid the bills for the appliances in the house. On the evening of March 31, she began to argue with Dixon after he chastised her daughters for opening and drinking a bottle of orange juice. The argument then escalated into a fight. Dixon had been yelling at Hamlett while pointing a finger close to her face, and at the end of his yelling poked Hamlett in the eye with his finger. Subsequently both Dixon and Hamlett pushed and punched one another, and threw things at each other. At one point Dixon grabbed Hamlett from behind and caused her to fall down a small flight of stairs. On cross-examination, Hamlett testified that she had been convicted of falsification in the past.
 {¶ 5} Hamlett's daughters testified that they had lived with Dixon at 573 Sherwood Avenue, and that they had lived with Dixon at other points prior to Sherwood Avenue, though the dates and the daughters' recollections differed slightly. Hamlett's older *Page 2 
daughter testified that she witnessed Dixon poking Hamlett in the eye, but that she did not think Dixon did it on purpose. She heard Hamlett and Dixon fighting and throwing things, and also witnessed Hamlett on the basement floor after hearing someone fall down the stairs. Hamlett's younger daughter did not remember the incident or the subsequent interactions with the police.
 {¶ 6} The responding officers observed injuries on both Hamlett and Dixon, heard consistent statements from Hamlett and her daughters about the incident, and heard statements from Dixon that Hamlett, her brother, and her boyfriend were the aggressors. Officer Joe Moran testified that he developed the impression that the four lived together due to the statements of Hamlett and her daughters, along with his own observation of the belongings of Hamlett and her daughters in the bedrooms of the residence on Sherwood Avenue. According to Moran's testimony, Dixon stated that he was allowing Hamlett and her daughters to stay with him temporarily until they found another place to live. Officer Rodney Lewis testified that, as he came to transport Dixon from the scene, Dixon stated that Hamlett and her daughters were not supposed to be in Dixon's house.
 {¶ 7} The State also offered evidence of Hamlett's rental agreement for a freezer at 573 Sherwood Avenue, as well as pictures of the incident, one of which showed multiple boxes of children's cereal strewn about the kitchen floor, and others showing Hamlett's physical injuries.
 {¶ 8} Conversely, Dixon testified that Hamlett and her daughters had never lived with him, that they lived nearby over a number of years, and Hamlett and Dixon would spend time with each other at their respective residences. Dixon and Hamlett were romantically involved for approximately three years, until 2004. When asked about police reports from May 2006, where Hamlett was referred to as Dixon's girlfriend, and August 2006, where Hamlett was described as moving out of Dixon's residence, Dixon stated that the officers were mistaken, that she was not his girlfriend at the time and did not live with him. Dixon did not remember seeing the aforementioned freezer in his residence on Sherwood Avenue, and that Hamlett had listed Dixon's address on the freezer rental agreement as part of a fraudulent plan. *Page 3 
 {¶ 9} As to the events of March 31, 2007, Dixon testified that Hamlet came to his house to ask for money and was accompanied by her brother, her boyfriend, and her oldest daughter. He noticed an injury to Hamlett's eye when she came into his house. When Dixon refused to give her money, Hamlett hit Dixon's head with a lamp, had her daughter cut his phone cord, and had the men deadbolt the door to the house so that Dixon could not leave. As Dixon tried to get away, Hamlett grabbed a hammer and knocked out one of Dixon's teeth, then got a knife and cut Dixon's hand. Hamlett threw kitchen grease as Dixon was trying to ascend the steps to the kitchen, which subsequently caused both Hamlett and Dixon to fall down the steps together. Hamlett threw bleach on Dixon and tried to grab him, but he managed to get out of the house and then yelled for someone to call the police. Dixon testified that when the police arrived, they did not believe him and did not pay attention to his side of the story.
 {¶ 10} Dixon's mother testified that Hamlett did not live with Dixon at any point, that Hamlett had been romantically involved with Dixon more than one year ago, that Hamlett was introduced to her in 2002, and that Hamlett had spent one Christmas with Dixon's family. She also testified that Hamlett had the key to Dixon's residence because Dixon left it there upon being arrested on March 31.
 {¶ 11} Case Manager Judy Byrd testified that she had received no reports of Dixon being in violation of the Section 8 housing rule that prohibits other non-applicants from residing with him. She had no personal knowledge of whether or not Hamlett was residing with Dixon. Housing specialist and inspector Brenda C. Weaver testified that, three years prior to the incident at issue, she had performed a scheduled inspection of Dixon's residence in 2004. During that 2004 inspection, it did not appear to Weaver that anyone was living with Dixon in violation of his lease.
 {¶ 12} At the close of the bench trial, the court found Dixon not guilty of cruelty to animals and child endangerment, and guilty of domestic violence. Dixon was sentenced to 75 days in jail, fined $200.00 plus costs, placed on basic probation supervision for one year, and ordered to undergo anger management counseling.
 {¶ 13} In his sole assignment of error, Dixon asserts: *Page 4 
 {¶ 14} "The trial court denied appellant due process under the fourteenth amendment due to the fact he was found guilty of domestic violence pursuant to R.C. 2919.25(A) when said conviction was not based upon sufficient evidence displaying appellant's guilt beyond a reasonable doubt and the trial court's verdict was inconsistent with the evidence and testimony presented at trial."
 {¶ 15} Dixon's assignment of error contains both a claim regarding the sufficiency of the evidence and a claim regarding the weight of the evidence. An evaluation of the sufficiency of the evidence and an evaluation of the weight of the evidence are two distinct processes.State v. Thompkins, 78 Ohio St.3d 380, 386, 1997-Ohio-52,678 N.E.2d 541. These two concepts will be addressed separately.
 Sufficiency of the Evidence {¶ 16} Dixon argues that there was not sufficient evidence to prove that Hamlett had cohabitated with Dixon or that Dixon had knowingly caused or attempted to cause physical harm to Hamlett. In reviewing a challenge of insufficient evidence, "the inquiry is, after viewing the evidence in the light most favorable to the prosecution, whether any reasonable trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." State v. Jenks (1991),61 Ohio St.3d 259, 273, 574 N.E.2d 492, following Jackson v. Virginia (1979),443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560. The court does not examine the credibility of the witnesses, nor does it weigh the evidence in this process. State v. Herring, 94 Ohio St.3d 246, 253, 2002-Ohio-796,762 N.E.2d 940. Whether the prosecution presented sufficient evidence is a question of law, and a conviction based on legally insufficient evidence denies the defendant his right to due process. Thompkins at 386-387.
 {¶ 17} Dixon was found guilty of domestic violence in violation of R.C. 2919.25(A) which states, "No person shall knowingly cause or attempt to cause physical harm to a family or household member." Dixon first challenges the sufficiency of the evidence that Hamlett was a family or household member.
 {¶ 18} Family or household member is defined in R.C. 2919.25(F)(1) as, "A spouse, a person living as a spouse, or a former spouse of the offender." Person living *Page 5 
as a spouse is defined in R.C. 2919.25(F)(2) as "a person who * * * is cohabitating with the offender, or who otherwise has cohabitated with the offender within five years prior to the date of the alleged commission of the act in question." The essential elements of cohabitation are the sharing of financial or familial responsibilities and consortium. State v. Williams (1997), 79 Ohio St.3d 459, 465,1997-Ohio-79, 683 N.E.2d 1126. In considering whether two people are sharing financial or familial responsibilities, a court might consider who is providing or sharing shelter, food, clothing, or assets. Id. To find consortium, a court might consider whether there has been "mutual respect, fidelity, affection, society, cooperation, solace, comfort, aid of each other, friendship, or conjugal relations" between the two parties. Id. The burden of establishing cohabitation is not substantial, and it is decided according to the unique facts of each case. State v.Woulard, 158 Ohio App.3d 31, 2004-Ohio-3395, 813 N.E.2d 964, at ¶ 73.
 {¶ 19} Looking at the testimonial and other evidence in a light most favorable to the State, the State proved the consortium requirement of cohabitation. Witnesses for both sides testified that Hamlett and Dixon had been romantically involved over the years. Dixon was involved in the lives of Hamlett's daughters. Although Dixon is not their biological father, Hamlett testified that he has been a "father figure" to them because he has been the primary male figure in their lives, and both daughters testified that they have known Dixon as far back as they were able to remember. Hamlett testified that she was involved with Dixon's family, which was confirmed by Dixon's mother, who described Ham lett's participation in some family activities. These facts fulfill the consortium requirement of cohabitation. Hamlett and her daughters lived with Dixon, Hamlett and Dixon each paid bills toward various aspects of their living arrangements, and both owned property within the same residence, thus fulfilling the financial and familial responsibility requirement of cohabitation. Because of their cohabitation, there is sufficient evidence for a trier of fact to find that Hamlett was a "family or household member" in relation to Dixon for the purposes of R.C. 2919.25(A).
 {¶ 20} Dixon next argues that the State presented insufficient evidence that he knowingly caused or attempted to cause physical harm to Hamlett. Physical harm *Page 6 
includes "any injury, illness, or other physiological impairment, regardless of its gravity or duration." R.C. 2901.01(A)(3). Under R.C. 2901.22(B), someone acts knowingly, "regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature." The accused does not have to commence a series of actions with the intent to act knowingly: if he was aware that the result from his actions was probable, then the person has acted knowingly. Id.; State v. Wenger (1979), 58 Ohio St.2d 336, 339, 12 O.O.3d 309, 390 N.E.2d 801. When a person acts knowingly, "[m]otive, purpose, or mistake of fact is [of] no significance." Wenger at 339.
 {¶ 21} There is sufficient evidence that Dixon knowingly caused physical harm to Hamlett. In addition to the pushes and punches that Dixon inflicted during the mutual combat between the two, Dixon instigated physical aggression by poking Hamlett in the eye, and escalated the physical confrontation by pulling Hamlett down a flight of stairs while her back was to him. A reasonable trier of fact could find that Dixon was aware that he was about to make these physical contacts with Hamlett, and that doing so would probably cause her physical harm. Accordingly, there was sufficient evidence for the trial court to find that the essential elements of domestic violence were proven beyond a reasonable doubt.
 Manifest Weight of the Evidence {¶ 22} Dixon next argues that the findings regarding Dixon's mens rea, Hamlett's injuries, and Hamlett's cohabitation with Dixon were against the manifest weight of the evidence because the State's evidence was unbelievable and inconsistent, and because Hamlett was an unreliable witness due to her past falsification conviction.
 {¶ 23} When a court conducts a manifest-weight analysis, it weighs all of the evidence and reasonable inferences, considers the credibility of each witness, and determines whether the fact-finder clearly lost her way in resolving conflicts in the evidence to the point that she "created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." State v. Thompkins,78 Ohio St.3d 380, 387, 1997-Ohio-52, 678 N.E.2d 541. The factors that a reviewing court may *Page 7 
consider in a manifest weight analysis include: whether the evidence was incredible; whether the evidence was uncontradicted; whether a witness was impeached; what was not proved; the certainty of the evidence; the reliability of the evidence; whether any witness' testimony was self-serving, and whether the evidence was vague, uncertain, conflicting, fragmentary, or illogical. State v. Brown, 7th Dist. No. 03MA231, 2005-Ohio-4502, at ¶ 35-45. See also State v. Apanovitch
(1987), 33 Ohio St.3d 19, 23-24, 514 N.E.2d 394, citing State v.Mattison (1985), 23 Ohio App.3d 10, 23 OBR 43, 490 N.E.2d 926, syllabus.
 {¶ 24} The manifest-weight analysis is a broader inquiry into the original trial, but only allows for a reversal in exceptional circumstances. Thompkins at 387. This is because the trier of fact was in the best position to determine the credibility of the witnesses and the weight due to the evidence. State v. DeHass (1967),10 Ohio St.2d 230, 231, 39 O.O.2d 366, 227 N.E.2d 212. Thus the reviewing court must determine whether the appellant or the appellee provided the more believable evidence, but must not completely substitute its judgment for that of the original trier of fact "unless it is patently apparent that the factfinder lost its way." State v. Woulard, 158 Ohio App.3d 31,2004-Ohio-3395, 813 N.E.2d 964, at ¶ 81.
 {¶ 25} All of the witnesses consistently testified that Dixon and Hamlett had been in a relationship starting around 2002, though the end-date of their relationship varied greatly. Hamlett and both of her daughters testified that they had lived with Dixon for long periods prior to the residence on Sherwood Avenue, although there was some inconsistency in the daughters' testimony as to time and place. They were consistent in their testimony that they had lived with Dixon at 573 Sherwood Avenue. Officer Moran corroborated their statements through his observation of the women's belongings in the residence, as well as reporting that all three women made consistent statements on the night of the incident. The trial court inferred that there were children living in the residence from a picture in the evidence that showed multiple boxes of children's cereal in the kitchen.
 {¶ 26} Conversely, Dixon and his grandmother consistently testified that Hamlett *Page 8 
and her daughters had never lived with Dixon. Dixon testified that Hamlett had not stepped foot in his residence at 573 Sherwood Avenue until the evening of the incident on March 31. Dixon's counsel, however, asked Officer Moran to clarify that Dixon was "letting [Hamlett] and her children stay there until they could get another place to live." Dixon's testimony was further contradicted by that of Officer Burton, who testified that Dixon stated the night of the incident that he had been allowing Hamlett and her children to stay with him temporarily. Dixon's statements regarding their relationship and living situation also contradicted two police reports from 2006, though Dixon argued that the police were mistaken.
 {¶ 27} Although the State's evidence was not perfectly consistent at all times, evidence Dixon presented was repeatedly contradicted and contradictory. The trial court specifically stated that it did not believe Dixon's testimony, and there is no reason for this court to find that the State's evidence was unbelievable. The trial court did not lose its way when deciding that Hamlett was cohabitating with Dixon and thus a "family or household member" in relation to Dixon for the purposes of R.C. 2919.25(A).
 {¶ 28} The finding that Dixon knowingly caused physical harm to Hamlett was also not against the manifest weight of the evidence. Both Hamlett and one eyewitness testified consistently about Hamlett's eye injury and fall down the stairs, as well as the intermittent mutual fighting between Hamlett and Dixon. Hamlett's injuries were corroborated by officer testimony and photographs.
 {¶ 29} Dixon's testimony indicated that Hamlett's eye was in an injured state before she arrived at his residence on March 31, that he did not hit or push her, and that he spent the entire incident trying to get away from Hamlett as she bludgeoned and stabbed him. Dixon's testimony was inconsistent with officer testimony that Dixon claimed the incident was "mutual combat." Dixon's testimony is also inconsistent with his own argument on appeal, which now claims that he did injure Hamlett's eye during the incident, though by accident and in self-defense.
 {¶ 30} The fact-finder's resolution of the parties' conflicting testimony did not result in a miscarriage of justice. Although Hamlett's overall credibility was undermined by her *Page 9 
past falsification conviction, the trial court was not then obligated to find her testimony about the specific incident to be incredible. The record does not indicate that the fact-finder lost its way when, after considering all of the evidence presented, the trial court found that the State provided more believable evidence. This is not one of those "exceptional cases" that warrants a reversal, and as such, was not decided against the manifest weight of the evidence. Dixon's sole assignment of error is meritless.
 {¶ 31} The essential elements of Dixon's domestic violence charge were established, and the weight of the evidence was in favor of the State. Dixon's conviction was therefore based on legally sufficient evidence, and not against the manifest weight of the evidence. Accordingly, the judgment of the trial court is affirmed.
Vukovich, P.J., concurs.
Donofrio, J., concurs. *Page 1