DECISION AND JUDGMENT ENTRY
{¶ 1} A Scioto County jury found inmate, Eric Dixon, guilty of assault on a corrections officer, based upon an incident in which Dixon purportedly attacked a guard who had attempted to perform a random search of Dixon's cell. On appeal, Dixon argues that his conviction is against the manifest weight of the evidence because the State's evidence was contradicted by testimony that the corrections officer had been the aggressor and that Dixon had acted in self defense. Thus, Dixon argues that the jury lost its way in crediting the State's evidence over his testimony and that of another inmate who claimed to be an eyewitness. However, we leave credibility determinations to the finder of fact. Because the jury could reasonably return a guilty verdict based on the State's version of the events, we cannot say that the jury clearly lost its way and *Page 2 
created such a manifest miscarriage of justice that we must reverse the conviction. Accordingly, we affirm the judgment below.
 I. Facts {¶ 2} Dixon is an inmate at the Southern Ohio Correctional Facility in Lucasville. On August 5, 2005, Corrections Officer David Penrod chose Dixon's cell for a random search under a prison policy that required him to perform three random searches during his shift. At trial, Penrod testified that he informed Dixon that he was going to search Dixon's cell and instructed him to "cuff up." He explained that before corrections officers perform a random cell search, they instruct the inmate to place his hands behind his back while standing near the cell's door. The corrections officer then places handcuffs through a hatch and reaches into the cell in order to secure the inmate. According to Penrod's testimony, he properly handcuffed Dixon. Penrod then called for Dixon's door to be opened. According to Penrod, after the door opened and as he looked away from Dixon to return his phone to his side, Dixon punched him in the mouth. One of Dixon's arms was no longer in the handcuffs. The two men fought outside the cell door until Penrod heard other inmates yell "kick his ass." Because he feared that other inmates might grab him and hold him against the bars while Dixon attacked him, Penrod attempted to "bear hug" Dixon and push him back into the cell. Dixon hit Penrod multiple times and attempted to scratch out Penrod's eyes. Penrod was able to reach his "man down" button and summon assistance. Corrections Officer Keith Frazer responded and pulled Dixon off Penrod. Corrections Officer Chet Stambaugh also responded and removed Dixon to a higher security cell. Both Frazer and Stambaugh *Page 3 
testified that Dixon complied with their instructions and that Dixon remained silent following this altercation.
 {¶ 3} Trooper Barry Call of the Ohio State Highway Patrol investigated this incident and took a statement from Dixon after reading him his constitutional rights. In this statement, Dixon explained that Penrod had entered his cell because of "the heated words we exchanged earlier in the week and earlier in the day" regarding "the way he looks at me in his arrogant, smug look. It was a hostile look." Dixon also said that Penrod had handcuffed his left hand but not his right hand and that he had not slipped out of his handcuffs. According to Dixon, Penrod then "charged in with his hands out trying to grab me." He said that he hit Penrod five times and that Penrod hit him once in the ribs.
 {¶ 4} At trial, Dixon presented the testimony of Michael Sabo, an inmate in the cell adjoining Dixon's cell. Sabo testified that Penrod and Dixon had been "talkin' trash" earlier that morning. He explained that he could see Dixon's cell by sticking his identification card through his bars and by looking at the reflection on the card's magnetic strip. Sabo testified that Penrod purposely had not handcuffed Dixon and had charged into Dixon's cell after the door opened. Sabo said that when Frazer arrived in response to the "man down" signal, Penrod said "no wait, wait" and Frazer allowed Penrod to continue attacking Dixon. On cross-examination, Sabo admitted that he could not see inside Dixon's cell, which was where Penrod handcuffed Dixon's hands. He also admitted that he could not remember whether Penrod had called to open the door with a phone or whether he had signaled with his hands. Sabo denied that he held *Page 4 
any animosity toward Penrod because Penrod had previously moved him to his current cell when he wanted to stay where he had been.
 {¶ 5} Dixon testified that he and Penrod had been "disrespecting each other" and that Penrod had been using racial slurs. He explained that Penrod had not handcuffed his right hand and that, "[a]fter the door opened he charged me, lunged toward me, slinging his fists." He testified that Penrod punched him a few times and that, when Frazer arrived, Penrod let him go. Dixon explained that the corrections officers use random searches for retaliation and that he believed that Penrod had searched his cell and attacked him in retaliation for the "heated exchange of words." Dixon admitted that he did not tell any of the corrections officers who responded that he had been attacked or injured by Penrod. Dixon testified that he did not read his statement after Trooper Call prepared it, and he claimed that Trooper Call did not accurately record his statement.
 {¶ 6} The jury found Dixon guilty of assaulting a corrections officer, and the trial court sentenced Dixon to eleven months in prison to be served consecutive to the sentence Dixon had been currently serving. Dixon filed this appeal.
 II. Assignment of Error {¶ 7} Dixon presents one assignment of error: "Eric Dixon's conviction for assault on a corrections officer was against the manifest weight of the evidence. (Passim.)"
 III. The Manifest Weight of the Evidence {¶ 8} In determining whether a criminal conviction is against the manifest weight of the evidence, an appellate court must review the entire record, weigh the evidence *Page 5 
and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed. State v. Elmore,111 Ohio St.3d 515, 2006-Ohio-6207, 857 N.E.2d 547, at ¶ 44; State v.Thompkins, 78 Ohio St.3d 380, 387, 1997-Ohio-52, 678 N.E.2d 541;State v. Martin (1983), 20 Ohio App.3d 172, 175, 485 N.E.2d 717. A reviewing court will not reverse a conviction where there is substantial evidence upon which the court could reasonably conclude that all the elements of an offense have been proven beyond a reasonable doubt.State v. Johnson (1991), 58 Ohio St.3d 40, 41, 567 N.E.2d 266; State v.Eskridge (1988), 38 Ohio St.3d 56, 526 N.E.2d 304, paragraph two of the syllabus. However, the weight to be given evidence, and the credibility to be afforded testimony, are issues to be determined by the trier of fact. State v. Dye (1998), 82 Ohio St.3d 323, 329, 1998-Ohio-234,695 N.E.2d 763; State v. Frazier (1995), 73 Ohio St.3d 323, 339,1995-Ohio-235, 652 N.E.2d 1000. The fact finder "is best able to view the witnesses and observe their demeanor, gestures, and voice inflections, and use these observations in weighing the credibility of proffered testimony." Seasons Coal Co. v. Cleveland (1984),10 Ohio St.3d 77, 80, 461 N.E.2d 1273.
 {¶ 9} Dixon relies on eight guidelines for making a determination whether a conviction is against the manifest weight of the evidence put forward by the Eighth District Court of Appeals in State v Mattison
(1985), 23 Ohio App.3d 10, 490 N.E.2d 926, syllabus: "1. The reviewing court is not required to accept as true the incredible; 2. whether the evidence is uncontradicted; 3. whether a witness was impeached; 4. what was not proved; 5. the certainty of the evidence; 6. the reliability of the evidence; 7. *Page 6 
whether a witness' testimony is self-serving; 8. whether the evidence is vague, uncertain, conflicting or fragmentary." He contends that each of these factors weighs in his favor.
 {¶ 10} Dixon argues that this Court need not accept as true "the highly implausible allegation that Dixon was able to extricate one hand from a pair of handcuffs that had allegedly been secured by Penrod." He also argues that Penrod's testimony was impeached by other witnesses who testified they were aware of no inmates slipping free from handcuffs unless the inmate had placed lubricant on his wrists. Dixon contends that Penrod's testimony was also contradicted by "an eyewitness with nothing to gain from his testimony" and who "would inarguably run an increased risk of harassment" by corrections officers for testifying against a corrections officer. He also points out that the State put forward no reason why Dixon would attack Penrod "out of the blue" and produced no evidence that Dixon was a sociopath who would attack another person for no reason. Dixon argues that Penrod's testimony is self-serving and unreliable because Penrod had to testify that Dixon started the fight or risk losing his job. Thus, Dixon contends that his conviction is against the manifest weight of the evidence.
 {¶ 11} The crux of Dixon's argument is that the jury could not reasonably credit Penrod's testimony over that of Dixon and Sabo. However, as we explained in State v. Murphy, Ross. App. 07CA2953,2008-Ohio-1744, at ¶ 31,
 [i]t is the trier of fact's role to determine what evidence is the most credible and convincing. The fact finder is charged with the duty of choosing between two competing versions of events, both of which are plausible and have some factual support. Our role is simply to insure the decision is based upon reason and fact. We do not second guess a decision that has some basis in these two factors, even if we might see matters differently. *Page 7 
Accordingly, we cannot say that the jury "clearly lost its way" in crediting the State's evidence over Dixon's version of the incident. Although we recognize that the State's witnesses testified that it is unlikely that an inmate could escape a properly secured handcuff, the jury could reasonably draw the inference that Penrod honestly believed that he had properly secured the handcuffs when, in fact, he had failed to do so. Nonetheless, we acknowledge that a reasonable jury could discredit the State's evidence for the reasons Dixon raises: the improbability that an experienced corrections officer would improperly secure the handcuffs, the inference that Penrod left the handcuff unsecured so that he could create a pretext for fighting Dixon, and the motive to lie that a corrections officer would have if he had attacked a prisoner.
 {¶ 12} However, a reasonable jury could also discredit Dixon's and Sabo's testimony. The prosecution impeached Sabo by pointing out his inability to see whether Penrod had purposely left the handcuffs unsecured or not, as he admitted that he could not see into the cell by looking at the reflection on the magnetic strip of his identification card. The prosecution also raised the possible existence of Sabo's personal bias against Penrod for moving Sabo to a new cell when he wanted to remain where he was. Furthermore, Sabo's testimony was inconsistent with Dixon's testimony in an important respect. Sabo testified that, after Frazer responded to the "man down" signal, Penrod told him to wait and Frazer stood aside while Penrod assaulted Dixon. However, Dixon himself testified that, when Frazer appeared, Penrod stopped attacking him. Accordingly, the jury could reasonably discredit Sabo's testimony.
 {¶ 13} Similarly, a reasonable jury could discredit Dixon's testimony. Although Dixon signed a statement in which he claimed Penrod had hit him once in the ribs, *Page 8 
Dixon testified at trial that Penrod had hit him multiple times in the ribs and the head. Dixon testified that he had not read the statement he signed and that Trooper Call misrepresented the interview by failing to record his claims that Penrod had been the aggressor. However, Dixon admitted at trial that he had not told the corrections officers who arrived in response to the "man down" signal that Penrod had attacked him. Furthermore, Dixon provided no explanation for his failure to report Penrod for attacking him. However, we recognize that parts of Dixon's statement are consistent with Dixon's testimony at trial.
 {¶ 14} Nonetheless, we leave the issues of weight and credibility of the evidence to the fact finder, as long as there is a rational basis in the record for their decision. Murphy, supra, at ¶ 31; State v.Lewis, Lawrence App. No. 06CA20, 2007-Ohio-2250, at ¶ 12. We defer to the fact finder on these issues because the fact finder "`is best able to view the witnesses and observe their demeanor, gestures, and voice inflections, and use these observations in weighing the credibility of proffered testimony.'" Id., quoting Seasons Coal Co. v. Cleveland
(1984), 10 Ohio St.3d 77, 80.
 {¶ 15} Because the testimony of Penrod and Trooper Call, as well as Dixon's own signed statement, provides a rational and substantial basis for the jury's verdict, we cannot say that the jury clearly lost its way and created such a manifest miscarriage of justice that we must reverse Dixon's conviction.
 {¶ 16} Accordingly, we overrule his sole assignment of error and affirm the judgment below.
 JUDGMENT AFFIRMED. *Page 9 
 JUDGMENT ENTRY
It is ordered that the JUDGMENT IS AFFIRMED and that Appellant shall pay the costs.
The Court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this Court directing the Scioto County Common Pleas Court to carry this judgment into execution.
IF A STAY OF EXECUTION OF SENTENCE AND RELEASE UPON BAIL HAS BEEN PREVIOUSLY GRANTED BY THE TRIAL COURT OR THIS COURT, it is temporarily continued for a period not to exceed sixty days upon the bail previously posted. The purpose of a continued stay is to allow Appellant to file with the Supreme Court of Ohio an application for a stay during the pendency of proceedings in that court. If a stay is continued by this entry, it will terminate at the earlier of the expiration of the sixty day period, or the failure of the Appellant to file a notice of appeal with the Supreme Court of Ohio in the forty-five day appeal period pursuant to Rule II, Sec. 2 of the Rules of Practice of the Supreme Court of Ohio. Additionally, if the Supreme Court of Ohio dismisses the appeal prior to expiration of sixty days, the stay will terminate as of the date of such dismissal.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure. Exceptions.
 Kline, J. McFarland, J.: Concur in Judgment and Opinion. *Page 1