[Cite as *State v. Rumbaugh*, 2012-Ohio-3806.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

---

JOURNAL ENTRY AND OPINION
**No. 97564**

---

## STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

## JONATHAN RUMBAUGH

DEFENDANT-APPELLANT

---

**JUDGMENT:**
**AFFIRMED**

---

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-545550

**BEFORE:** Kilbane, J., Boyle, P.J., and Cooney, J.

**RELEASED AND JOURNALIZED:** August 23, 2012

**ATTORNEY FOR APPELLANT**

Russell S. Bensing
1350 Standard Building
1370 Ontario Street
Cleveland, Ohio 44113

**ATTORNEYS FOR APPELLEE**

William D. Mason
Cuyahoga County Prosecutor
John P. Colan
Steven E. Gall
Assistant County Prosecutors
The Justice Center - 8th Floor
1200 Ontario Street
Cleveland, Ohio 44113

MARY EILEEN KILBANE, J.:

{¶1} Defendant-appellant, Jonathan Rumbaugh, appeals from his conviction for gross sexual imposition. For the reasons set forth below, we affirm.

{¶2} On February 7, 2011, defendant was indicted pursuant to a six-count indictment for alleged offenses against Jane Doe on November 20, 2010. Defendant was charged with two counts of rape, one count of sexual battery, two counts of gross sexual imposition, in violation of R.C. 2907.05(A)(1) and R.C. 2907.05(A)(5), and one count of kidnapping.

{¶3} The matter proceeded to a jury trial on August 29, 2011. The state presented the testimony of the victim; her boyfriend; her friend, Helen Chutte-Sammons ("Chutte-Sammons"); Scott Demico ("Demico"); her co-workers, Candace Campbell ("Campbell") and Linda Medina ("Medina"); and Middleburg Heights Police Lieutenant Robert Swanson (Lt. Swanson).

{¶4} The victim testified that she is a widow and now resides with her boyfriend in Middleburg Heights. The defendant, whom she knows as "Cowboy Jay," is her boyfriend's friend. On the Friday after Thanksgiving 2010, she and her boyfriend went to Players Club Bar & Grill ("Players Club") in Strongsville. The victim had a couple of glasses of wine. After the bar closed, she and her boyfriend returned home with some of her boyfriend's friends, which included the defendant, Demico, and Lance Dolfler

("Dolfler"). The group gathered in their soundproof music room. They listened to music and played the dice game "Greedy." During this time, the victim drank another one and one-half glasses of wine.

{¶5} At approximately 3:30 a.m., the victim kissed her boyfriend goodnight and left the group. She went to her room, put on her thermal nightgown, washed off her make-up, and went to bed. She stated that she fell asleep and believed that she was having an erotic dream about the defendant. She quickly awoke and found defendant on top of her, sucking her breast, and inserting his fingers into her vagina. The victim testified that the bedroom door was open, and the light from the nearby living room was turned on, so she could clearly see the defendant. She stated that she pushed the defendant off of her and said, "What the hell are you doing?" Defendant said that he was looking for her boyfriend's bedroom. She yelled at him to leave. After defendant left, the victim began to cry. She decided against telling her boyfriend because she believed that he would harm defendant.

{¶6} The next morning, the victim awoke at 9:00 a.m. She noticed the defendant and her boyfriend's other friends, Demico and Dolfler, were sleeping in the living room. She showered, and then left for work at around 11:00 a.m. She did not speak with anyone at work about the incident. Later that evening, she called her friend, Chutte-Sammons, and told her what had happened. The victim further testified that she felt degraded, embarrassed, and humiliated. She was reluctant to contact the police because she did not want to have to speak to a man about what had happened.

{¶7} Later that night, she told her boyfriend what had happened. They decided to confront the defendant on the following Friday night at the Players Club. That night, the group met as planned. According to the victim, her boyfriend spoke with defendant for about ten minutes, then defendant approached her and apologized. Following her discussion with a counselor from the Rape Crisis Center, she concluded that defendant should cut his hair as a sign of his remorse, because his hair is very important to him. The victim's boyfriend then conveyed this request to defendant.

{¶8} The group met at the bar again on the following Tuesday or Wednesday. At this time, the victim observed that defendant had not cut his hair. She began to cry and asked him why he had gotten into bed with her. The defendant reportedly replied that he was "wasted." She also asked him why he did not cut his hair, but he had no answer.

{¶9} About a week later, she went to the Middleburg Heights police and completed a police report. Several days later she spoke with Lt. Swanson and a detective.

{¶10} The victim and her boyfriend went to the Players Club again around Christmas time. Defendant was there speaking with a bartender, and the bartender told the victim and her boyfriend that they were not welcome at the bar because they "brought a police presence to the bar that was unwelcome."

{¶11} On cross-examination, the victim acknowledged that her boyfriend had recently been convicted of assaulting a police officer. She also admitted that defendant

had filed a complaint with the Strongsville police about her. She acknowledged that the idea of having the defendant get a haircut as a sign of remorse in fact sounds "kooky."

{¶12} The victim's boyfriend testified that he has committed alcohol- and drug-related offenses, and is more prone to violence when he drinks. On the night of the alleged attack, he spent time with the defendant at Players Club and decided to invite him and friends, Demico and Dolfler, to his home after the bar closed.

{¶13} The group played a dice game, then his girlfriend left the group and went to sleep. According to the boyfriend, the defendant stated that he had to use the bathroom. He was gone for "a considerable amount of time" and was "chipper" when he returned. The boyfriend further testified that his friend Demico left, but defendant was "pretty loaded" so he invited him and Dolfler to stay overnight. His girlfriend woke up early and went to work, and by the time the boyfriend woke up, his friends were gone.

{¶14} Later that night, the victim told him that defendant had gotten into her bed and inappropriately touched her. According to the boyfriend, the victim was crying hysterically. The boyfriend explained that it was up to the victim to decide how to handle the matter and that he would support her decision. He claimed, however, that a Rape Crisis Center counselor came up with the idea of having the defendant cut his hair, "because that's one of his prize possessions."

{¶15} The boyfriend further testified that he went to the bar the following Friday and confronted defendant about the matter. Defendant stated that he did not know what

he was talking about, and defendant's brother quickly intervened. According to the boyfriend, defendant and the victim did not speak to each other that evening.

{¶16} Several days later, the boyfriend and the victim returned to the bar. The boyfriend told the bartender what had happened, and the victim spoke privately with defendant. Later, the boyfriend left a phone message for defendant, telling him to cut his hair in order to avoid having to go to court over the matter.

{¶17} On cross-examination, the boyfriend admitted that in his police report, he stated that the victim came up with the idea of defendant cutting his hair. He stated that he had no idea that defendant had filed complaints against him and his girlfriend with the Strongsville police on November 29, 2010, and December 9, 2010.

{¶18} The boyfriend read the narrative of one of defendant's Strongsville police reports on redirect examination. In relevant part, it stated, "lady told him she and her boyfriend would make false allegations about him if he doesn't cut his long hair. * * * [S]ubjects * * * possibly live on Smith Road in Middleburg Heights." In the remainder of the report, defendant said that he did not want the police to have contact with the complainant, and he was advised by the police that they could not help him if he refused to authorize contact.

{¶19} Chutte-Sammons testified that she has known the victim since 1983. She stated that the victim telephoned her twice to discuss the incident involving defendant. Chutte-Sammons abruptly ended the first conversation because one of her children

needed something. During the second conversation, the victim was very upset, and Chutte-Sammons told her to handle the matter in whatever way seemed right for her.

{¶20} Campbell and Medina testified that they work with the victim, and that she is generally an upbeat person. Around Thanksgiving 2010, however, the victim seemed distraught. They had a discussion at the end of the workday, during which the victim told them about the alleged incident with the defendant and was crying.

{¶21} Lt. Swanson testified that the victim reported the incident on December 13, 2010. He then contacted her and learned that she had discussed it with her coworkers, and she had also called the local and national Rape Crisis hotlines. Lt. Swanson determined that calls to the hotlines had been made from the victim's cell phone. Lt. Swanson also spoke with Demico, Dolfler, and the woman's coworkers. Another officer spoke with the woman's boyfriend. The names of two other individuals were provided to the police, but they did not give statements.

{¶22} On December 20, 2010, Lt. Swanson telephoned defendant. He then spoke with defendant in a recorded interview at the police station. Defendant stated that "some things were fuzzy" and that he could not recall other information. He then claimed that he clearly remembered that the woman was the aggressor. According to defendant, when he exited the bathroom, the victim grabbed him, pushed him into the bedroom, and started kissing him. The defendant reportedly told the victim that he was not going to do this, pushed her away, and rejoined the group in the music room.

{¶23} Demico testified that he, Dolfler, and the defendant were part of the group that listened to music with the victim at her boyfriend's house. According to Demico, Dolfler left the group and fell asleep on a couch. Shortly thereafter, the victim said that she was going to sleep because she had to get up early the following morning. Demico next noticed that defendant was also gone. Fifteen to 20 minutes later, defendant returned. Demico spent the night with the group, but he was uncertain whether defendant and Dolfler had also spent the night there.

{¶24} Following the presentation of the state's case, trial court dismissed the kidnapping charge pursuant to Crim.R. 29. Defendant then presented testimony from Miranda Beach ("Miranda") and Angela Beach ("Angela").

{¶25} Miranda testified that she is a bartender at Players Club in Strongsville. Defendant is one of her customers, and he frequently helps when they are busy. The victim and her boyfriend also go to the bar. Miranda testified that around Thanksgiving, the victim told her about an incident involving defendant and asked that she not be left alone with him. She next observed the woman's boyfriend speaking with defendant at the bar, and a few days later, Miranda observed the victim speaking with defendant. She did not hear either conversation, but she learned that the woman wanted defendant to cut his hair. Later, the victim came to the bar six or seven additional times to check on whether defendant had cut his hair. Miranda ultimately told Lt. Swanson that the victim and her boyfriend were no longer welcome at the bar.

{¶26} Angela, sister-in-law of Miranda, testified that she is also a bartender at the Players Club. She testified that, around Thanksgiving 2010, she observed the victim's boyfriend speak with defendant, then pat him on the back and shake his hand.

{¶27} The jury subsequently acquitted defendant of rape as charged in Counts 1 and 2, acquitted him of sexual battery as charged in Count 3, acquitted him of gross sexual imposition as charged in Count 4, and convicted defendant of gross sexual imposition, in violation of R.C. 2907.05(A)(5), as charged in Count 5 of the indictment. The trial court sentenced him to nine months of imprisonment and five years of mandatory postrelease control sanctions.

{¶28} Defendant now appeals, assigning one error for our review.

{¶29} For his sole assignment of error, defendant asserts that his conviction is against the manifest weight of the evidence. He maintains that the testimony presented by the victim and her boyfriend regarding the confrontation with defendant and the request that he get a haircut as a sign of remorse is so unusual that no reasonable jury could have accepted it. He also complains that the victim waited two weeks before contacting the police, and that witnesses in the bar where the haircut discussion occurred contradicted the victim's claim that defendant was remorseful after the alleged attack.

{¶30} With regard to a manifest weight challenge, the Ohio Supreme Court in *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 25, stated as follows:

[A] reviewing court asks whose evidence is more persuasive — the state's or the defendant's? * * * "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a 'thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony." [*State v.*] *Thompkins*, [78 Ohio St.3d 380, 1997-Ohio-52, 678 N.E.2d 541] at 387, citing *Tibbs v. Florida,* 457 U.S. 31, 42, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982).

**{¶31}** In *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983), the court set forth the proper test to be utilized when addressing the issue of manifest weight of the evidence:

> The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of the witnesses and determines whether in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

**{¶32}** Reversal on manifest weight grounds is reserved for "the exceptional case in which the evidence weighs heavily against the conviction." *Id.* In addition, this court must remain mindful that the weight to be given the evidence and the credibility of the witnesses are matters left primarily to the jury. *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967).

**{¶33}** In this matter, defendant was convicted of gross sexual imposition in violation of R.C. 2907.05(A)(5), which provides:

(A) No person shall have sexual contact with another, not the spouse of the offender; cause another, not the spouse of the offender, to have sexual contact with the offender; or cause two or more other persons to have sexual contact when any of the following applies:

* * *

(5) The ability of the other person to resist or consent or the ability of one of the other persons to resist or consent is substantially impaired because of a mental or physical condition or because of advanced age, and the offender knows or has reasonable cause to believe that the ability to resist or consent of the other person or of one of the other persons is substantially impaired because of a mental or physical condition or because of advanced age.

{¶34} In this matter, the state's evidence clearly demonstrated that the woman left the group in the music room, washed off her make-up and changed, then went to bed. A short time later, defendant also left the group in the music room. The testimony of the victim credibly and consistently indicated that defendant entered her bedroom, got on top of her, sucked on her breast, and inserted his fingers into her vagina. The state's evidence also indicated that the woman tearfully relayed the incident to her friends at work, made calls to the local and national Rape Crisis hotlines a few days later, and that the woman and her boyfriend confronted defendant in the bar about the incident.

{¶35} Moreover, while we agree with defendant that the woman's idea that defendant's cutting of his hair as a symbol of his remorse is unusual, we do not find that this aspect of the record is so outlandish as to call into question all of the woman's testimony. That is, this aspect of the woman's testimony does not negate any of the

elements of the offense or otherwise undermine the evidence supporting the conviction. It was within the province of the jury to choose not to discredit all of her testimony. *See State v. Mattison*, 23 Ohio App.3d 10, 15, 490 N.E.2d 926 (8th Dist.1985) (testimony was unusual but not so unlikely as to be incredible and to negate the state's entire case).

{¶36} Further, although defendant's witnesses provided testimony about events following the alleged attack, they did not refute the victim's claims about the incident in the bedroom. To the contrary, the testimony of defendant's witnesses supported the assertion that an issue arose between defendant and the victim around Thanksgiving 2010. From that time forward, the victim consistently claimed that defendant attacked her in her bed, and the police commenced an investigation into defendant's conduct with the woman. In addition, defendant offered shifting statements, first indicating that "some things were fuzzy" and that he could not recall other events, and then indicated that he clearly remembered that the woman had initiated the sexual contact.

{¶37} In conclusion, the record, taken as a whole, amply supports defendant's conviction for gross sexual imposition. The great weight of the evidence demonstrates that defendant left the party shortly after the woman went to sleep, he entered her bedroom and committed the offense of gross sexual imposition upon her. The jury was free to reject defendant's claim that the victim was the aggressor. *DeHass,*10 Ohio St.2d 230, 227 N.E.2d 212 (1967). The jury did not lose its way in convicting defendant of the offense.

{¶38} We find defendant's sole assignment of error without merit.

{¶39} Judgment affirmed.


It is ordered that appellee recover from appellant costs herein taxed.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____

MARY EILEEN KILBANE, JUDGE

MARY J. BOYLE, P.J., CONCURS;
COLLEEN CONWAY COONEY, J., CONCURS IN JUDGMENT ONLY